# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    and

MICHAEL A. COX, Attorney General              Case No. 03-C-0371
for the State of Michigan, *ex rel.*
MICHIGAN DEPARTMENT OF
ENVIRONMENTAL QUALITY,

        Plaintiffs,

and

CLEAN WISCONSIN, SIERRA CLUB, and
CITIZENS' UTILITY BOARD,

        Intervenors,

    v.

WISCONSIN ELECTRIC POWER COMPANY,

        Defendant.

---

## DECISION AND ORDER
## GRANTING PLAINTIFFS' MOTION FOR ENTRY OF AN ORDER (DOC. # 36)

        This court has been asked to approve a proposed amended consent decree between the United States Environmental Protection Agency (EPA) and the Wisconsin Electric Power Company (WEPCO), a subsidiary of We Energies. The proposed consent decree would resolve claims of the United States EPA against WEPCO for alleged violations of the Prevention of Significant Deterioration (PSD) provisions in Part C of Subchapter I of the Act, 42 U.S.C. §§ 7470-92, the nonattainment New Source Review (NSR) provisions in

Part D of Subchapter I of the Act, 42 U.S.C. §§ 7501-7515, and the federally-enforceable State Implementation Plans developed by Michigan and Wisconsin. Several parties have intervened, including the State of Michigan, Clean Wisconsin, Sierra Club, and the Citizens' Utility Board. The purported effect of the amended consent decree depends on the brief and expert. Either the settlement guarantees substantial emission reductions in oxides of nitrogen ($NO_x$), sulfur dioxide ($SO_2$) and particulate matter (PM), or it fails the environment and the citizens of Wisconsin and Michigan by allowing emissions to continue unabated.

This court is satisfied that emissions will not continue unabated. In reviewing the settlement, the court does not have the unbridled discretion to revise a particular paragraph, impose its own standards, or otherwise reallocate settlement dollars between the twenty-three coal-fired, electric utility steam generating units located in five coal-fired power plants in Michigan and Wisconsin (Presque Isle Generating Station in Marquette, Michigan; Pleasant Prairie Generating Station in Kenosha, Wisconsin; South Oak Creek Generating Station in Oak Creek, Wisconsin; Port Washington Generating Station in Port Washington, Wisconsin; and Valley Generating Station in Milwaukee, Wisconsin). Although the settlement does not provide for everything that the EPA could have obtained had it litigated and prevailed on each of the alleged sixteen violations set forth in a 1991 memorandum, any settlement, by definition, is an adjustment or compromise of differences. *Blacks Law Dictionary* 1372 (6th Ed. 1990). This settlement at issue appears to offer considerable benefits to human health and the environment. WEPCO must implement technology improvements to reduce emissions at the Presque Isle plant in Michigan and the Valley plant in Milwaukee, Wisconsin, and there are declining system-wide emission limits that apply to all five plants. In addition, WEPCO must pay a civil penalty of $3.1 million to the United

2

States, $100,000 to the State of Michigan, and implement a $20 - $25 TOXECON project at Presque Isle, which is designed to achieve a 90% removal of all species of mercury. Overall, this court is satisfied that the settlement is reasonable, fair, and consistent with the statutory purposes of the Clean Air Act. Consequently, the court will grant plaintiffs' motion to enter the proposed amended consent decree.

BACKGROUND

Plaintiff United States, acting at the request of the Administrator of the EPA, filed its complaint on April 29, 2003, against WEPCO, pursuant to Sections 113(b) and 167 of the Clean Air Act, 42 U.S.C. §§ 7413(b) and 7477, seeking injunctive relief and the assessment of civil penalties. (Doc. # 1) That same day, the parties filed notice of lodging the proposed consent decree and proposed consent decree. (Docs. ## 2 and 3) This court conducted a status conference on June 26, 2003, during which time the United States represented that it had extended the time for public comment on the proposed consent decree. In addition, the United States expressed its intent to file a motion to intervene on behalf of the State of Michigan and a proposed amended consent decree. (Doc. # 17)

On July 10, 2003, the United States filed notice of lodging the proposed amended consent decree, along with the proposed amended consent decree. (Doc. ## 19 and 20) The notice advised that two changes had been made to the proposed consent decree: (1) changes to reflect the addition of the State of Michigan as a plaintiff-intervenor (changes to the Penalty and Fines Section and to the Resolution of Claims Section); and (2) clarifying changes made to six paragraphs in which WEPCO's emissions would be limited to levels that are measured as either a 30-day or 12-month rolling average. On July 21, 2003, this court granted the State of Michigan leave to intervene. (Doc. # 21) The United

3

States restarted the 30-day public comment period, 68 Fed. Reg. 43750, and the public comment period closed on September 2, 2003.

The United States received nine letters commenting on the proposed amended consent decree. (Attachments to Memorandum in Support of the United States' Motion to Enter Proposed Amended Consent Decree, Exs. 11A - 11I) The letters were submitted by government entities (the Attorney General for the State of Wisconsin, and the City Administrator of the City of Oak Creek), non-profit organizations (the Sierra Club, Clean Wisconsin, the Citizens' Utility Board, Citizens for Responsible Power, the Clean Air Task Force, and the Environmental Law & Policy Center), and individuals (Barbara Eisenberg, William J. Lavelette, and Robert Nemanich).

On October 1, 2003, the Sierra Club, Clean Wisconsin and the Citizens Utility Board filed a motion to intervene. (Doc. # 23) Three weeks later, the United States filed a motion to enter the amended consent decree as the order of the court. (Doc. # 36) Over the objection of the United States, the court granted the Sierra Club, Clean Wisconsin and Citizens Utility Board's motion to intervene and set a briefing schedule on the proposed amended consent decree. (Doc. # 45) The parties have completed the briefing ordered by the court.

On April 28, 2006, the United States, the State of Michigan and the Wisconsin Electric Power Company filed a letter agreement relating to the amended consent decree lodged with the court on July 10, 2003. The letter sets forth modifications to the proposed amended decree pursuant to paragraph 190, which provides:

> The terms of this Consent Decree may be modified only by a
> subsequent written agreement signed by all Parties. Where the

4

modification constitutes a material change to any term of this Decree, it shall be effective only upon approval by the Court.

The letter agreement amends paragraph 96 of the amended consent decree as follows:

However, notwithstanding this requirement, Wisconsin Electric may use and certify Continuous Opacity Monitors (COMS) and PM CEMS on Presque Isle Units 5 and 6 and Valley Unit 1 provided that Wisconsin Electric satisfies the requirements set forth in the April 20, 2006, Letter Agreement to Modify the proposed Amended Consent Decree.

It is the position of the United States, State of Michigan and the Wisconsin Electric Company that these provisions are not material and would not require court approval. (Doc. # 105) The intervenors respond that the amended consent decree cannot be modified without re-lodging the proposed agreement to allow for public comment pursuant to 28 C.F.R. § 50.7. (Doc. # 107)

PLAINTIFFS' MOTION FOR ENTRY

This court reviews a consent decree to assure that it is fair, reasonable, adequate, and consistent with applicable law. *See United States v. Union Elec. Co.*, 132 F.3d 422, 430 (8th Cir. 1997). The purpose of this review is to determine whether the decree adequately protects and is consistent with the public interest. *United States v. Seymour Recycling Corp.*, 554 F. Supp. 1334, 1337 (D.C. Ind. 1982). A consent decree will not be approved where the agreement is illegal, a product of collusion, inequitable, or contrary to the public good. *Kelley v. Thomas Solvent Co.*, 717 F. Supp. 507, 515 (W.D. Mich. 1989).

The court must keep in mind the strong policy favoring voluntary settlement of disputes without litigation. *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir.1990); *United States v. Hooker Chem. & Plastics Corp.*, 776 F.2d 410, 411 (2d Cir.

5

1985). This presumption is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal agency, like the EPA, which enjoys substantial expertise in the environmental field. *See United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1426 (6th Cir. 1991); *Hooker*, 776 F.2d at 411; *Kelley*, 717 F. Supp. at 515-16. Although the court must avoid any rubberstamp approval in favor of an independent evaluation, *Kelley*, 717 F. Supp. at 515, it cannot substitute its judgment for that of the parties nor conduct the type of detailed investigation required if the parties were actually trying the case. *Akzo*, 949 F.2d at 1434; *United States v. County of Muskegon*, 33 F. Supp. 2d, 614, 621 (W.D. Mich. 1998); *Seymour*, 554 F. Supp. at 1338 (citing *Airline Stewards v. American Airlines*, 573 F.2d 960, 963 (7th Cir.1978)). The test is not whether this court would have fashioned the same remedy nor whether it is the best possible settlement. *Cannons,* 899 F.2d at 84; *Kelley*, 717 F. Supp. at 515.

The court first turns to the issue of fairness. A consent decree must be both procedurally and substantively fair. *Cannons*, 899 F.2d at 86. Procedural fairness concerns the negotiations process, i.e., whether it was open and at arms-length. *Id.* Substantive fairness concerns concepts of corrective justice and accountability. *Id.* at 87. In assessing fairness, courts consider: (1) a comparison of the strength of plaintiff's case versus the amount of settlement offer; (2) the likely complexity, length, and expense of the litigation; (3) the amount of opposition to the settlement among affected parties; (4) the opinion of counsel; and (5) the stage of the proceedings and amount of discovery already undertaken at the time of the settlement. *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985).

Several letters received during the comment period question the procedural fairness of the process. Citizens for Responsible Power asserts that, in Wisconsin, the "voice of the people was inexplicably and unfairly excluded from that process." (Doc. # 38, ¶ 11, Ex. B) Steven Bulik, writing on behalf of Citizens for Responsible Power, urges the United States to "reopen settlement talks with We Energies" and to invite state "Attorney General Peg Lautenschlager and DNR Secretary Scott Hassett to actively participate in framing a revised version of the agreement." (*Id.*) Wisconsin Attorney General Peggy A. Lautenschlager - who has since left office - accuses the United States of failing to follow the public notification requirements of the CAA. At the same time, Lautenschlager concedes that a representative of her office had been invited to attend a meeting in Chicago at which the proposed consent decree was to be discussed, but did not attend because the federal government had insisted that Wisconsin agree not to divulge information it might obtain from the meeting. (*Id.,* Ex. E) Finally, in joint comments prepared by Clean Wisconsin, Sierra Club, and Citizens Utility Board, the intervenors accuse the United States of failing to comply with its duty to notify the State of Wisconsin about the details of the violations it believed to have occurred before filing a complaint. (*Id.,* Ex. H)

The United States maintains that it made the same opportunities to participate in the settlement to the State of Wisconsin as it afforded to the State of Michigan. While Wisconsin's Attorney General's office declined to participate, the State of Michigan elected to participate and intervened in the pending lawsuit. The State of Michigan was allowed to participate even though it never signed the confidentiality agreement. That the United States requested confidentiality with respect to the negotiations does not have any bearing on the candor, openness, and the bargaining balance as between the parties to the

7

negotiation." *U.S. v. BP Exploration & Oil Co.*, 167 F. Supp. 2d 1045, 1052 (N.D. Ill. 2001). Moreover, representatives of the Wisconsin Department of Natural Resources (WDNR) attended an in-person settlement meeting and participated in several conference calls thereafter. Hence, it cannot be said that Wisconsin was cut out of the negotiations.

Further, the United States maintains that it complied with the statutory notice requirement at § 113(a)(1), 42 U.S.C. § 7413(a)(1) when the EPA contacted the WDNR in March of 2003, and provided the State with specific information regarding the alleged violations and included the WDNR representatives in meetings and conference calls in which the settlement terms were negotiated. This is consistent with paragraph 11 of the complaint which alleges that the United States provided Michigan and Wisconsin with actual notice of WEPCO's violations.

Indeed, section 113 of the CAA is silent as to the form of the notice. In *United States v. B & W Inv. Properties*, 38 F.3d 362, 367 (7th Cir. 1994), actual notice –rather than formal written notice – was deemed sufficient. Similarly, the Sixth Circuit Court of Appeals held that the notice requirement was satisfied where the states were given actual notice of the alleged violations more than thirty days prior to the filing of a second amended complaint. *Akzo*, 949 F.2d at 1051.

Here, George T. Czerniak, Jr., Branch Chief for the Air Enforcement and Compliance Assistance Branch, Air and Radiation Division, of the U.S. EPA, filed a declaration indicating that on at least two occasions, he spoke with Lloyd Eagan, Bureau Direction, Bureau of Air Management of the WDNR concerning the EPA's finding that WEPCO was not in compliance with the State implementation plan. (Decl. Czerniak, ¶ 2) The first conversation was on or about March 24, 2003, and the second communication was

8

on March 27, 2003, during a visit to the WDNR. Attached to his declaration is a April 25, 2003, letter from Eagan confirming that on March 24, 2003, the EPA called to notify Wisconsin that the EPA intended to pursue settlement discussions with WEPCO associated with the potential past violations of federal air regulatory requirements.

More recently, the intervenors have argued that the proposed amended decree is not procedurally fair because "throughout the review process the government and WEPCO claimed that the decree would reduce air pollution emitted from the Valley power plant." They further assert that the "public was led to believe, based on the scant allegations in the government's complaint, that it had little information about the violations at the Valley and Presque Isle power plants." In support, the intervenors rely upon an 1991 internal EPA memorandum produced during discovery.

The memorandum, dated February 23, 2001, provides in pertinent part:

Preliminary review of WEPCO Power Company's (WEPCO) response to an EPA Request for Information issued pursuant to section 114 of the Clean Air Act, indicates that WEPCO may have undertaken several major modifications without appropriate environmental review.

On December 7, 2000, U.S. EPA issued a Request for Information to WEPCO concerning modifications at several of their facilities located in Wisconsin and Michigan. On February 16, 2001, WEPCO submitted its response to that request. Preliminary review by my staff shows 16 potential major modifications at five WEPCO power plants. The documents submitted by WEPCO indicate that it spent more than $95 million dollars on these 16 major projects. Attached is a spreadsheet summarizing these potential major modifications.

Notably, thirteen of the sixteen projects discussed in the memorandum occurred at the Pleasant Prairie, Oak Creek and Port Washington plants. The intervenors do not challenge the amended consent decree with respect to these three plants.

More importantly, the intervenors claim that the memorandum sets forth the EPA's "candid assessment that the Proposed Decree allows far more pollution than if WEPCO were required to install modern pollution controls at each of its offending plants." In particular, the intervenors argue that "were WEPCO required to install modern pollution controls on those units where EPA had identified violations, the annual emissions for all five power plants would be 20,143 tons of $NO_x$ and 53,007 tons of $SO_2$. Instead of requiring at least this much pollution reduction, the Proposed Decree allows WEPCO to emit 31 percent more $NO_x$ and 68 percent more $SO_2$, i.e. 33,772 and 69,801 tons of $NO_x$ and $SO_2$ respectively." (Doc. # 76)

The intervenors are mistaken. It is clear that the EPA memorandum clearly sets forth "emission reduction totals" – not "emissions." The numbers cited by the intervenors are located in the memorandum at EPA_WEPCO000573, which provides:

### WE ENERGIES

### BACT at Units w/ Capital Projects vs. Consent Decree

**Emission Reduction Totals**

*...*

**Total Michigan and Wisconsin Reductions**

|  | $NO_x$ | $SO_2$ |
|---|---|---|
| BACT | 20,143 | 53,007 |
| Under the Consent Decree | 33,772 | 69,801 |

Hence, the consent decree secures greater reductions overall than the EPA would have obtained had it litigated and prevailed in full. Under the amended consent decree, $NO_x$ reductions are 33,772 tons compared with 20,143 tons under Best Available Control

10

Technology (BACT). Moreover, $SO_2$ reductions under the decree are 69,801 tons compared with 53,007 under BACT. That is, the emission reduction total under the decree is greater than the emission reduction totals if the EPA required BACT on each of the offending units in all five plants

Similarly, the court is not persuaded that the public was deceived regarding the violations at Valley and Presque Isle and the proposed reductions under the decree. The Federal Register notice requesting comment, which is attached to the Declaration of Richard Oehler, reflects the relevant issues, and references the allegations in the complaint respecting "major modifications" at the Presque Isle Generating Station and Valley Generating Station in Milwaukee County. The notice directs the public to the consent decree, which was made publicly available. In addition, the complaints filed by the EPA and Michigan identify the types of "major modifications," including but not limited to "replacement of economizers, induced draft fans, waterwall tubes, reheaters and superheaters on one or more units at the plant." (Complaint, ¶ 41)

The intervenors cite to the "puffery" in the EPA's April 2003 public announcement, which states in part:

Settlement Terms:

***Injunctive Relief:*** WEPCO will spend an estimated $600 million over a 10-year period to implement the following injunctive relief:

• Reduce emissions of $SO_2$ from about 98,500 tons per year to about 26,200 tons per year through the installation of state-of-the-art $SO_2$ controls on a majority of the generating capacity of its coal-fired power plant fleet. In addition, WEPCO will either retire or install state-of-the-art $SO_2$ controls on an additional percentage of the generating capacity or retire those $SO_2$ emissions at all of its major coal-fired facilities. In addition, WEPCO

11

will surrender excess $SO_2$ emission allowances each year beginning in 2008 based on 2007 emission allowances. This surrender will prevent WEPCO and others from using these allowances to emit additional pollution into the environment.

• Achieve 32,600 tons of $NO_x$ reductions annually from WEPCO's coal-fired power plants by operating new state-of-the-art selective catalytic reduction control systems all year long, on a majority of its coal-fired power plant fleet. In addition, for the remaining units covered under the agreement, WEPCO must elect to install state-of-the-art $NO_x$ controls or retire an additional percentage of generating capacity. WEPCO also must comply with a system-wide cap and rate controlling $NO_x$ emissions at all of its major coal-fired facilities.

The intervenors submit that any such statements with respect to Presque Isle and the Valley plants are illusory. After careful review of the amended consent decree and the supporting documents, the court finds the EPA's statements consistent with projected emission levels and decree requirements.

Generally, WEPCO must install BACT on 80 percent of the megawatts in the WEPCO system, and take additional $NO_x$ and $SO_2$ mitigation measures on the remaining 20 percent. WEPCO must implement particulate matter PM performance requirements at all five plants, achieve system-wide declining $NO_x$ and $SO_2$ emission caps and rates, and incur $20 to $25 million to install the TOXECON project at several Presque Isle units. Further, WEPCO must forgo certain $SO_2$ allowances and pay in excess of $3.2 million in fines. During the hearing on August 17, 2004, counsel for the intervenors conceded that the intervenors are not contesting the 80 percent or the size of the penalty. (Doc. 68, pp. 23-25)

The Valley and Presque Isle facilities are required to meet the following plant-specific 12-Month Rolling Tonnage:

12

| Plant | $NO_x$ | $SO_2$ |
|---|---|---|
| Valley | 3,989 | 9,973 |
| Presque Isle | 7,376 | 17,257 |

(Proposed Amended Consent Decree, ¶ 174)  This translates into a decrease of 32% from the Valley's 2001 emissions of $SO_2$, and a combined valley decrease of 4,000 TPY.   Loren Denton, a Senior Environmental Engineer in the Air Enforcement Division of the EPA, calculates a 62% reduction in PM emission from the Valley plant.  (Doc. # 86, Decl. Denton, Ex. B, ¶ 6)   Similarly, the Presque Isle $SO_2$ emissions decrease by 1,065 TPY, $NO_x$ emissions decrease by 4,686 TPY, and the PM emissions decrease by 28 TPY.

The proposed amended consent decree requires that Presque Isle Units 1, 2, 3, and 4 be retrofitted with Flue Gas Desulfurization and Selective Catalytic Reduction technology for SO2 and NOx control, respectively, or retired.  (Proposed Amended Consent Decree, ¶¶ 57, 58 and 73)   All remaining Presque Isle and Valley Units must operate low $NO_x$ burners or combustion control technology, and make upgrades to computer systems to limit $NO_x$ emissions.  (*Id.*, ¶ 61)

WEPCO has installed improvements to the Valley low $NO_x$ burners by replacing the burner nozzles and making other hardware replacements and air flow adjustments. (Decl. Coughlin, ¶ 7) WEPCO has installed combustion optimization software at the Valley as contemplated by the decree.  (Proposed Amended Consent Decree, ¶ 61) The proposed amended consent decree is accurate in stating that there are existing low $NO_x$ burners on Units 7-9 at Presque Isle, but WEPCO has upgraded these Units by installing directional flame burner stationary coal nozzles with integral flame stabilizers.   These

upgrades have already reduced the $NO_x$ emission rate by approximately 15 to 20 percent compared to 2002 levels. (Decl. Coughlin, ¶¶ 16, 17).

Presque Isle Units 1 and 2 must operate under their own $NO_x$ cap, and meet system-wide caps. (*Id.*, ¶ 64) If Presque Isle Unit 1 or 2 ever exceeds this cap, it must install and operate LNB technologies (low $NO_x$ burners) no later than December 31 of the calendar year following such exceedance as a penalty for non-compliance with the decree. (*Id.*) In addition, all units not receiving state-of-the-art controls or retiring cannot receive petroleum coke. (*Id.*, at ¶ 85) Presque Isle and the Valley must install and operate Continuous Emission Monitoring Systems for PM. (*Id.,* ¶¶ 91-96) Further, Units 7-9 are further covered by the by the TOXECON project referred to the decree, and part of which the Department of Energy estimates could result in a reduction of $SO_2$ and $NO_x$ emissions by 70 and 30 percent.

The court is not persuaded that WEPCO will be able to make physical changes at the Valley and Presque Isle Units 5-9 that increase the $NO_x$ and $SO_2$ emissions because the proposed amended consent decree subjects WEPCO to more stringent controls if any future modification at these facilities cause an increase in the maximum hourly emission rate. (*Id.*, ¶ 131(A)) The Resolution of Claims further provide that any increase in annual emissions attributable to a future modification that causes or contributes to a violation of a NAAQS or PSD increment is prohibited. (*Id.*, ¶ 131(C)(2))

The Declaration of Randall Robinson, the Regional Meteorologist, Air and Radiation Division, Air Toxics and Assessment Branch of the EPA, Region 5, explains that some pollutants are not emitted directly from the stack but form in the atmosphere as a

14

result of chemical reactions. (Doc. # 38, Ex. 15) These are considered regional pollutants, such as secondary particulate matter formed when gaseous sulfur oxide and nitrogen oxide emissions from the stack travel downwind and react to form very small particles. (*Id.*, ¶ 4) Four Wisconsin plants - Port Washington, Oak Creek, Valley and Pleasant Prairie - are within 90-100 kilometers of each other in Southeastern Wisconsin. (*Id.*, ¶ 5) Therefore, reductions in nitrogen oxide and sulfur oxide emissions should improve air quality in Milwaukee, Southeast Wisconsin, and downwind at distances of 100 km of each WEPCO plant. (*Id.*, ¶ 6) In addition, reductions in PM and $SO_2$ resulting from the decree's requirement that WEPCO discontinue the use of petroleum coke as a fuel at the Valley Plant should provide air quality benefits in the immediate vicinity of the Valley plant and at greater distances downwind. (*Id.*, ¶ 9) Finally, the implementation of $SO_2$ and $NO_x$ control technologies being installed at the Wisconsin plants should similarly reduce mercury deposition downward of those plants. (*Id.*, ¶ 10)

The court acknowledges the Environmental Health & Engineering study prepared by the intervenors' expert, David MacIntosh, which concludes that the benefits of the decree cannot be evaluated on a regional basis. (Doc. # 78, Decl. MacIntosh) Rather, MacIntosh argues that the Valley is much more densely populated than the area downwind of other plants and that, from a public health perspective, emissions reductions at the Valley facility would be more valuable than emissions at Port Washington. (Decl. MacIntosh, ¶ 9) The MacIntosh study, however, addresses only one of the pollutants ($PM_{2.5}$) and does not address the reductions produced by the decree in the first instance. If his assertions are taken as true, the reductions achieved by the decree alone are 81 percent of the maximum

15

reductions achievable if BACT controls for PM were installed on the Valley plant. (Doc. 86, Decl. Denton, Table 3)

The court declined to conduct an evidentiary hearing regarding the experts because it is unnecessary. There is no dispute that BACT controls would achieve greater reductions at Valley or at Presque Isle. Yet requiring BACT at all units would not be a settlement - it would be more akin to a judgment against one party. WEPCO has stated unequivocally that it would not settle on those terms. Regardless, in reviewing the pending settlement, the court must consider what the decree achieves as well as what it does not achieve. The court has weighed the strengths and weaknesses of each expert report, and believes that the proposed decree provides a significant reduction in pollutants for the citizens of both states.

Based on the above facts, the court cannot agree with the intervenors' analysis. The states, through their agencies, were granted access to the enforcement information and invited to participate in the settlement. The public was apprised of the settlement and information was available upon request. Indeed the intervenors admitted during the August 17, 2004, hearing that they had obtained extensive information under the Freedom of Information Act, 5 U.S.C. § 552. (Doc. # 68, pp. 11-12) The 2001 EPA memorandum is not a smoking gun insofar as the intervenors have misread the document. Moreover, the court is not persuaded that the EPA's position is mere puffery. On this record, the court is satisfied that the amended consent decree is procedurally fair.

With respect to substantive fairness, the complaint asserts that "between 1982 and the present, WEPCO modified and thereafter operated certain coal-fired electricity generating units without first obtaining a PSD permit authorizing the construction and without

16

installing the best available technology to control emissions of sulfur dioxide, nitrogen oxides, and particulate matter, as required by the Act, applicable federal regulations, and the Michigan and Wisconsin SIPs." (Complaint, ¶ 2)  The complaint cites major modifications at the Oak Creek and the Presque Isle Facilities.  However, there are allegations that similar modifications were undertaken at the other facilities and that these modifications resulted in significant net emissions increases of $SO_2$, $NO_x$, and PM.

The intervenors argue that the proposed amended consent decree does not hold WEPCO accountable for approximately two decades of CAA violations at the Valley and Presque Isle power plants.  Moreover, they maintain that the ongoing violations have a disparate and significant harm on the Valley's downwind residents,  the majority of whom are low-income and minority.

The intervenors, through expert J. Phyllis Fox, engage in a lengthy analysis of whether boiler activities at Valley Units 1 and 2 and Presque Isle Units 3, 7, and 8 constitute modifications that would have triggered  New Source Performance Standards or the PSD provisions of the Clean Air Act.  Fox's calculations indicate that "the hourly and annual increases in emissions are high enough to trigger NSPS and PSD provisions of the Clean Air Act."  These provisions require compliance with NSPS emission rates and monitoring requirements, the installation of modern pollution control systems, and an air quality analysis to demonstrate that the new emissions will not violate the applicable national ambient air quality standards or the applicable PSD increment.  (Decl. J. Phyllis Fox, ¶ 13)

Suffice it to say that WEPCO does not concede liability.  WEPCO includes twenty-two affirmative defenses in its response to the intervenors' complaint and denies the intervenors' substantive allegations.  WEPCO has indicated that it would invoke the same

17

defenses seen in other cases against members of the electric utility industry for alleged modifications without PSD permits or installation of less than the best available control technology. Specifically, WEPCO maintains that the projects at issue are not considered major modifications because they were routine maintenance, repair and replacement activities and exempt from PSD permitting and control requirements. 40 C.F.R. § 52.21(b)(2)(iii)(a). Additionally, WEPCO would raise a statute of limitations defense with respect to construction activities that commenced over five years prior to the complaint. *See* 28 U.S.C. § 2462. The statute of limitations argument applies to all of the projects at the Valley, and most of the projects at Presque Isle. (Decl. Olson, ¶¶ 4, 8)

On April 2, 2007, the United States Supreme Court addressed what constitutes a "modification" at a facility that will trigger NSR under the CAA. *Environmental Defense v. Duke Energy Corp.*, – U.S. –, 127 S. Ct. 1423, 1434, 167 L. Ed. 2d 295 (2007). The Supreme Court deferred to the EPA's discretion to interpret the statutory definition of modification and remanded the case to the lower court for additional proceeding. *Id.* The Court left open Duke's ability to raise certain arguments on remand, including that the EPA has taken inconsistent positions over the years. *Id*, at 1436. In the end, no one can dispute the protracted nature of this type of litigation, where similar cases have been pending for years and the parties have devoted tens of thousands of hours. The proposed amended consent decree appears to be a careful assessment of litigation risks based on extensive experience with this type of litigation.

Next, the court considers the reasonableness, appropriateness and adequacy of the proposed amended consent decree. Specifically, the court considers: (1) the nature and extent of potential hazards; (2) the availability and likelihood of alternatives to the

18

consent decree; (3) whether the decree is technically adequate to accomplish the goal of cleaning the environment; (4) the extent to which the consent decree furthers the goals of the statutes which form the bases of the litigation; (5) the extent to which approval of the consent decree is in the public interest; and (6) whether the consent decree reflects the relative strength or weakness of the Government's case against the Defendants. *Akzo*, 949 F.2d at 1436; *Cannons*, 899 F.2d at 89-90; *Seymour*, 554 F. Supp. at 1339.

Much of this discussion overlaps with the arguments by the intervenors with respect to procedural fairness. The proposed amended consent decree addresses $NO_x$, $SO_2$, and PM emissions at the Presque Isle Generating Station in Marquette County, Michigan; the Pleasant Prairie Generating Station in Kenosha, Wisconsin, the South Oak Creek Generating Station in Oak Creek, Wisconsin, the Port Washington Generating Stations in Port Washington, Wisconsin, and the Valley Generating Station in Milwaukee, Wisconsin. All units must comply with a declining system-wide rate and cap for $SO_2$ and $NO_x$ emissions, and the proposed amended consent decree mandates unit-specific reductions for $NO_x$ and $SO_2$. In addition, WEPCO is required to upgrade its PM controls at each of its units.

WEPCO must amend each plant's operating permits issued pursuant to Title V, 42 U.S.C. § 7661-7661(f), and applications for new permits to include a schedule for all performance, operational, maintenance, and control technology directives established by the proposed amended consent decree, including, but not limited to, emission rates, removal efficiencies and caps on fuel use. (Proposed Amended Consent Decree, ¶ 172) In addition to the civil penalties (*Id.*, ¶ 118) and TOXECON project (*Id.*, ¶ ¶ 108 - 117), the proposed

19

amended consent decree requires WEPCO, within thirty days after written demand by the United States, to pay stipulated penalties. (*Id.*, ¶ 141)

This secures significant reductions on a system-wide basis without the time, expense and uncertainty of protracted litigation. An earlier Declaration of Loren Denton quantifies the anticipated environmental benefits of the proposed amended consent decree and compares those benefits with the likely reductions from implementation of the 2002 Environmental Cooperative Agreement (ECA) between WEPCO and the WDNR. (Doc. # 31, Decl. Denton, Ex. 1) According to Denton's analysis, under the proposed amended consent decree WEPCO's overall $SO_2$ emissions will drop from approximately 98,000 tons in 2001 to approximately 26,000 tons in 2013 – a total of 72,000 tons annually. (*Id.*, ¶ 5) $NO_x$ emissions in Michigan and Wisconsin are expected to drop from approximately 49,000 tons in 2001 to approximately 16,000 tons in 2013 – a total reduction of 33,000 tons annually. (*Id.*) Comparing reductions expected under the ECA to those expected under the proposed amended consent decree, Denton concluded that WEPCO's compliance with the Wisconsin specific terms of the proposed Decree will result in the annual reduction of approximately 31,000 tons of $SO_2$ and 2,000 tons of $NO_x$ thereby reducing emissions by a greater amount than would be achieved by compliance with the ECA. (*Id.,* at ¶ 8)

In addition, WEPCO's compliance with the proposed amended consent decree will serve to reduce mercury emissions in Wisconsin, because the requirements for unit retirements and the installation of both $NO_x$ and $SO_2$ controls in Wisconsin would be expected to reduce mercury emissions. Moreover, WEPCO's compliance will result in lower sulfur emissions at Presque Isle and the Valley as a consequence of using petroleum coke as fuel at these facilities.

20

The alternative is protracted litigation attempting to resolve what would likely be highly contested issues. Volumes of discovery and extensive briefing would be required in an attempt to achieve a similar result. In the end, there is no guarantee that the plaintiffs would secure the same results that they can achieve through the proposed amended consent decree.

A number of comments focus on the technical adequacy of the proposed amended consent decree, and whether it serves the statutory goals and/or the public interest. The Environmental Law & Policy Center, Attorney General Peg Lautenschlager, William J. Lavelette, and the Sierra Club, Clean Wisconsin and Citizens Utility Board (Attachments, Exs. 11A, 11E, 11F, and 11H) complain that the litigation has provided far too few details about the alleged violations to determine whether the settlement is fair and adequate. Similarly, they complain that the "$600 million agreement" pertains to many of the remedial measures that WEPCO previously committed to perform. (Attachments, Exs. 11E and 11H) Others, including Citizens for Responsible Power, Barbara Eisenberg, and Lavelette, argue that the civil penalty is too small (Attachments, Exs. 11B, 11C, 11E, 11F, and 11H), the time frame for compliance is too long (Attachments, Exs. 11C, 11E, 11H, and 11I), and that WEPCO should not be immune from suit for future activities. (Attachments, Exs. 11E, and 11H)

The United States responds, and the court agrees, that the proposed amended consent decree is broader than the 2002 ECA between WDNR and WEPCO and WEPCO's "Power for the Future Plan." The ECA has no effect on Presque Isle and has less stringent emission rates. As discussed above, the ECA would secure approximately 41,000 tons less of $SO_2$ and approximately 10,000 tons less of $NO_x$ than the proposed decree. Also, the ECA

21

must be renewed after five years. The United States represents that the "Power for the Future" plan anticipated reductions through unit shutdowns at the Port Washington facility alone.

With respect to the level of detail provided regarding the alleged violations, the complaint identifies violations dating back to 1982 including, "but not limited to, the replacement of economizers, induced draft fans, waterwall tubes, reheaters and superheaters on one or more of the units" at the Oak Creek plant. (Complaint, ¶ 41) The complaint in intervention of Michael A. Cox, Attorney General of the State of Michigan, alleges similar violations at Presque Isle. That the complaints do not charge specific violations at each and every plant is not fatal to the proposed amended consent decree. It is sufficient that the United States has asserted that violations occurred at each of the 23 units in the WEPCO system inasmuch as Rule 8(a) of the Federal Rules of Civil Procedure requires nothing more. Fed. R. Civ. P. 8(a). And, assuming that the violations are widespread, the decree requires WEPCO to install state of the art air pollution controls or elect to shut down units, representing 80 percent of its total coal-fired megawatt generating capacity. One hundred percent of the units covered must comply with the declining system-wide rate and cap for $SO_2$ and $NO_x$ emissions.

The penalty assessment criteria are set forth in 42 U.S.C. § 7413(e), and include the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation as established by credible evidence, payment by the violator of penalties previously assessed for the same violation, the economic benefit of noncompliance and the seriousness of the violation. These criteria are not assigned any particular weight, and the

22

court does not review the assessment for what would have been awarded had the United States prevailed on each and every issue at trial. The United States represents that the penalty assessment was arrived at by considering these factors, as well the size of the system alleged to be in violation, the proportionality of the penalty to that paid by other members of the industry to settle similar claims and the litigation risk of the United States. The court has reviewed the submissions regarding the other settlements and has considered the record before this court. It does not appear that the penalty is unreasonable or inadequate. *See U.S. v. Comunidades Unidas Contra La Contaminacion*, 204 F.3d 275, (1st Cir. 2000) (rejecting comments that the penalty was too low where the penalty assessment did not represent an abandonment of judgement).

To the extent that the time frame for compliance has been a source of concern, many of the deadlines occur relatively early. While the United States represents that it sought to lock in a more stringent emission rate that would last indefinitely, phasing is necessary because installing the controls takes time. It may take up to three years to install a particular device and the WEPCO system cannot take out several units and still meet the demand for electricity. The United States represents that this schedule is identical to the schedule obtained for the installation of controls from other companies in settlements to date.

Generally, "consent decrees are built on compromise and compromise in turn is a product of judgment." *Comunidades Unidas Contra La Contaminacion* , 204 F.3d at 282. Nothing suggests that the United States has abandoned its judgment in entering into the proposed amended consent decree. Thus, after careful consideration, the court finds that this compromise is fair, reasonable, adequate, and consistent with the policies

23

underlying the CAA. The parties, the citizens of Wisconsin and Michigan, and the environment will realize benefits from the proposed amended decree. While the intervenors have raised valid critiques of a particular sections, as a whole, the agreement is fair, just and reasonable when scrutinized under the appropriate standard of review.

Now, therefore,

IT IS ORDERED that the plaintiffs' motion for entry of the July 10, 2003, proposed amended consent decree is granted. This ruling does not address whether the 2006 letter agreement between the parties constitutes a material change to any term of the decree. The decree will be entered and effective on the date of this order.

Dated at Milwaukee, Wisconsin, this 30th day of September, 2007.

BY THE COURT


/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.