IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
'03    JUL 10    AM :53

EAS

rec'd.

UNITED STATES OF AMERICA )
)
and )
)
MICHAEL A. COX, Attorney General )
of the State of Michigan, ex rel. )
MICHIGAN DEPARTMENT )
OF ENVIRONMENTAL QUALITY )
)
Plaintiffs, )
)
v. )
)
WISCONSIN ELECTRIC POWER COMPANY, )
)
Defendant. )
)
)
_____)

SOFRON B. NEDILSKY
CLERK

# ORIGINAL

Civil Action No. 03-C-0371

U.S. DIST. COURT EAST DIST. WISC
FILED

OCT – 1 2007

AT_____ O'CLOCK_____M
JON W. SANFILIPPO, CLERK

## AMENDED CONSENT DECREE



# TABLE OF CONTENTS

I. Jurisdiction and Venue .......................................................... 5

II. Applicability ................................................................. 5

III. Definitions .................................................................. 6

IV. Units to be Controlled or Retired ............................................... 14

V. $NO_x$ Emission Reductions and Controls .......................................... 15

    A. $NO_x$ Emission Controls ................................................... 15

    B. System-wide $NO_x$ Emission Limits .......................................... 18

    C. $NO_x$ Emission Limitations at Presque Isle Units 1 and 2 ...................... 19

    D. Use of $NO_x$ Emission Allowances ........................................... 19

    E. General $NO_x$ Provisions ................................................... 21

VI. $SO_2$ Emission Reductions and Controls .......................................... 22

    A. $SO_2$ Emission Controls ................................................... 22

    B. System-wide $SO_2$ Emission Limits ......................................... .23

    C. Surrender of $SO_2$ Emission Allowances .................................... .24

    D. Fuel Limitations ........................................................ 27

    E. General $SO_2$ Provisions .................................................. 27

VII. PM Emission Reductions and Controls ............................................ 28

    A. Optimization of PM Controls .............................................. 28

    B. Upgrade of PM Controls .................................................. 28

    C. PM Monitoring .......................................................... 29

    D. General PM Provisions ................................................... 33

ii

VIII. Prohibition on Netting Credits or Offsets from Required Controls . . . . . . . . . . . . . . . . . . 34

IX. Environmental Projects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

X. Civil Penalty and Fine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

XI. Resolution of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    A. Resolution of Civil Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    B. Pursuit of Plaintiffs' Civil Claims Otherwise Resolved . . . . . . . . . . . . . . . . . . . . . . . . 41

XII. Periodic Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

XIII. Review and Approval of Submittals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

XIV. Stipulated Penalties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

XV. Force Majeure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

XVI. Dispute Resolution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

XVII. Emission Limitations on the South Oak Creek and Elm Road Generating Stations. . . . . 58

XVIII. Permits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

XIX. Information Collection and Retention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

XX. Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

XXI. Sales or Transfers of Ownership Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

XXII. Effective Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

XXIII. Retention of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

XXIV. Modification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

XXV. General Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

XXVI. Signatories and Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

XXVII. Public Comment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

XXVIII. Conditional Termination of Enforcement Under Decree . . . . . . . . . . . . . . . . . . . . . . . . 70

XXIX. Final Judgment .......................................................... 71

Case 2:03-cv-00371-CNC   Filed 10/01/07   Page 4 of 81   Document 116

WHEREAS, on April 29, 2003, the United States of America ("the United States"), on behalf of the United States Environmental Protection Agency ("EPA"), filed a Complaint against Wisconsin Electric pursuant to Sections 113(b) and 167 of the Clean Air Act (the "Act"), 42 U.S.C. §§ 7413(b) and 7477, for injunctive relief and the assessment of civil penalties for alleged violations of:

(a) the Prevention of Significant Deterioration provisions in Part C of Subchapter I of the Act, 42 U.S.C. §§ 7470-92;

(b) the nonattainment New Source Review provisions in Part D of Subchapter I of the Act, 42 U.S.C. §§ 7501-7515;

(c) the federally-enforceable State Implementation Plan developed by the State of Michigan (the "Michigan SIP"); and

(d) the federally-enforceable State Implementation Plan developed by the State of Wisconsin (the "Wisconsin SIP");

WHEREAS, in its Complaint, the United States alleges, *inter alia,* that Wisconsin Electric failed to obtain the necessary permits and install the controls necessary under the Act to reduce its sulfur dioxide, nitrogen oxides, and/or particulate matter emissions, and that such emissions can damage human health and the environment;

WHEREAS, the United States alleges that its Complaint states claims upon which relief can be granted against Wisconsin Electric under Sections 113 and 167 of the Act, 42 U.S.C. §§ 7413 and 7477, and 28 U.S.C. § 1355;

WHEREAS, Michael A. Cox, Attorney General of the State of Michigan, on behalf of the Michigan Department of Environmental Quality (the "State of Michigan"), has filed a Complaint

1

against Wisconsin Electric pursuant to Section 167 of the Act, 42 U.S.C. § 7477, and Section 5530 of Part 55 of Michigan's Natural Resources and Environmental Protection Act ("Part 55 of NREPA"), MCL § 324.5530, for injunctive relief and the assessment of civil fines for alleged violations of:

(a) the Prevention of Significant Deterioration provisions in Part C of Subchapter I of the Act, 42 U.S.C. §§ 7470-92; and

(b) Section 5505 of Part 55 of NREPA, MCL § 324.5505;

WHEREAS, in its Complaint, the State of Michigan alleges, *inter alia*, that Wisconsin Electric failed to obtain the necessary permits and install the controls necessary under the Act and Section 5505 of Part 55 of NREPA to reduce its emissions of sulfur dioxide, nitrogen oxides, and/or particulate matter emissions, and that such emissions can damage human health and the environment;

WHEREAS, the State of Michigan alleges that its Complaint states claims upon which relief can be granted against Wisconsin Electric under Section 167 of the Act, 42 U.S.C. § 7477, and Section 5505 of Part 55 of NREPA;

WHEREAS, Wisconsin Electric has not answered or otherwise responded to either the Complaint by the United States or the Complaint filed by the State of Michigan in light of the settlement memorialized in this Amended Consent Decree;

WHEREAS, Wisconsin Electric has denied and continues to deny the violations alleged in the Complaints, maintains that it has been and remains in compliance with the Act, Part 55 of NREPA, and is not liable for civil penalties, fines, or injunctive relief, and states that it is

2

agreeing to the obligations imposed by this Amended Consent Decree solely to avoid the costs and uncertainties of litigation and to reduce its emissions;

WHEREAS, Wisconsin Electric, consistent with its environmental, health and safety policy, met with the United States in February 2003, to resolve those Parties' respective goals for achieving emission reductions of certain emissions at the electric generating stations covered under this Amended Consent Decree;

WHEREAS, EPA provided Wisconsin Electric and the States of Michigan and Wisconsin with actual notice of violations pertaining to Wisconsin Electric's alleged violations, in accordance with Section 113(a)(1) of the Act, 42 U.S.C. § 7413(a)(1);

WHEREAS, Wisconsin Electric and the United States thereafter met with the State of Michigan in April 2003 to discuss resolution of the Parties' respective goals for achieving emission reductions of certain emissions at the Presque Isle Generating Station in Michigan;

WHEREAS, the Parties anticipate that the installation and operation of pollution control equipment pursuant to this Amended Consent Decree will achieve significant reductions in $SO_2$, $NO_x$ and PM emissions and thereby improve air quality and that certain actions that Wisconsin Electric has agreed to undertake are expected to advance technologies and methodologies for reducing certain air emissions, including mercury;

WHEREAS, nothing in this Amended Consent Decree is intended to prohibit the use by the State of Michigan of emission reductions under this Amended Consent Decree to demonstrate attainment with §110 of the Act (42 U.S.C. § 7410);

3

WHEREAS, Wisconsin Electric has begun the process of retiring the coal-fired units at the Port Washington Generating Station and has applied for and received permits to construct two new combined cycle natural gas units at that facility;

WHEREAS, Wisconsin Electric is seeking approval, including air emissions permits, to construct three new coal-fired units in Wisconsin at a site adjacent to the South Oak Creek Generating Station, designated as the Elm Road Generating Station;

WHEREAS, EPA supports the construction of cleaner power plants to meet growing energy demands;

WHEREAS, the Plaintiffs and Wisconsin Electric have agreed, and the Court by entering this Amended Consent Decree finds: that this Consent Decree has been negotiated in good faith and at arms length; that this settlement is fair, reasonable, in the best interest of the Parties and in the public interest; that the settlement is consistent with the goals of the Act; and that entry of this Amended Consent Decree without further litigation is the most appropriate means of resolving this matter;

and

WHEREAS, the Plaintiffs and Wisconsin Electric have consented to entry of this Amended Consent Decree without trial of any issue;

NOW, THEREFORE, without any admission of fact or law, and without any admission of the violations alleged in the Complaints it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

4

# I. JURISDICTION AND VENUE

1. This Court has jurisdiction over this action, the subject matter herein, and the Parties consenting hereto, pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367, Sections 113(b) and 167 of the Act, 42 U.S.C. §§ 7413(b) and 7477, MCL §324.5530, the Michigan SIP, 40 C.F.R. § 52.1180(b); 45 Fed. Reg. 8348 (February 7, 1980), and the Wisconsin SIP, 40 C.F.R. § 52.2570; Wis. Admin. Code, NR § 405. Venue is proper under Section 113(b) of the Act, 42 U.S.C. § 7413(b), and under 28 U.S.C. § 1391(b) and (c). Solely for the purposes of this Consent Decree and the Plaintiffs' underlying Complaints, Wisconsin Electric waives all objections and defenses that it may have to the claims set forth in the underlying Complaints, and to the jurisdiction of the Court over Wisconsin Electric and this action, and to venue in this District. Wisconsin Electric shall not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree. For purposes of the Complaints filed by the Plaintiffs in this matter and resolved by the Consent Decree, and for purposes of entry and enforcement of this Decree, Wisconsin Electric waives any defense or objection based on standing. Except as expressly provided for herein, this Consent Decree shall not create any rights in any party other than the Plaintiffs and Wisconsin Electric. Except as provided by Section XXVII (Public Comment), the Parties consent to entry of this Consent Decree without further notice.

# II. APPLICABILITY

2. Upon entry, the provisions of this Consent Decree shall apply to and be binding upon the United States, the State of Michigan, and Wisconsin Electric, its successors and assigns, and Wisconsin Electric's officers, employees, and agents solely in their capacities as such.

5

3. Wisconsin Electric shall provide a copy of this Consent Decree to all vendors, suppliers, consultants, contractors, agents, and any other company or organization retained to perform any of the work required by this Consent Decree. Notwithstanding any retention of contractors, subcontractors, or agents to perform any work required under this Consent Decree, Wisconsin Electric shall be responsible for ensuring that all work is performed in accordance with the requirements of this Consent Decree. In any action to enforce this Consent Decree, Wisconsin Electric shall not assert as a defense the failure of its officers, directors, employees, servants, agents, or contractors to take actions necessary to comply with this Consent Decree, unless Wisconsin Electric establishes that such failure resulted from a Force Majeure Event, as defined in Paragraph 150 of this Consent Decree.

## III. DEFINITIONS

4. A "30-day Rolling Average Emission Rate" shall be determined by calculating an arithmetic average of all hourly emission rates in lb/mmBTU for the current day and the previous 29 Operating Days. A new 30-day Rolling Average Emission Rate shall be calculated for each new Operating Day. Each 30-Day Rolling Average Emission Rate shall include all startup, shut down and Malfunction periods within each Operating Day. A Malfunction shall be excluded from this Emission Rate, however, if it is determined to be a Force Majeure Event and satisfies the Force Majeure provisions of this Consent Decree.

5. "30-Day Rolling Average Removal Efficiency" means the percent reduction in the mass of a pollutant achieved by a Unit's pollution control device over a 30-day period. This percentage shall be calculated by subtracting the Unit's outlet 30-Day Rolling Average Emission Rate from the Unit's inlet 30-Day Rolling Average Emission Rate, dividing that difference by the

6

Unit's inlet 30-Day Rolling Average Emission Rate, and then multiplying by 100. A new 30-Day Rolling Average Removal Efficiency shall be calculated for each new Operating Day, and shall include all periods of startup, shutdown and Malfunction within an Operating Day. A Malfunction shall be excluded from this removal efficiency, however, if it is determined to be a Force Majeure Event and satisfies the Force Majeure provisions of this Consent Decree.

6. "Air Quality Control Region" means a geographic area designated under Section 107(c) of the Act, 42 U.S.C. § 7407(c).

7. "Baseline" means the annual average emissions of $SO_2$ and $NO_x$ of the Plants in the Wisconsin Electric System for calendar years 2000 and 2001, as measured under 40 C.F.R. Part 75.

8. "Boiler Island" means a Unit's (A) fuel combustion system (including bunker, coal pulverizers, crusher, stoker, and fuel burners); (B) combustion air system; (C) steam generating system (i.e., firebox, boiler tubes and walls); and (D) draft system (excluding the stack), as further described in "Interpretation of Reconstruction," by John B. Rasnick, U.S. EPA (November 25, 1986) and the attachments thereto.

9. "BH" means baghouse, a pollution control device for the reduction of particulate matter ("PM").

10. "Capital Expenditure" means all capital expenditures, as defined by Generally Accepted Accounting Principles ("GAAP"), excluding the cost of installing or upgrading pollution control devices.

7

11. "CEMS" or "Continuous Emission Monitoring System" means, for obligations involving $NO_x$ and $SO_2$ under this Decree, the devices defined in 40 C.F.R. § 72.2 and installed and maintained as required by 40 C.F.R. Part 75.

12. "Clean Air Act" or "Act" means the federal Clean Air Act, 42 U.S.C. §§7401-7671q, and its implementing regulations.

13. "Consent Decree" or "Decree" means this Amended Consent Decree.

14. "Elm Road Generating Station" means the proposed coal-fired electric generating units, for which Wisconsin Electric is seeking regulatory approval to construct at a site adjacent to the South Oak Creek Generating Station.

15. "Emission Rate" means the number of pounds of pollutant emitted per million BTU of heat input ("lb/mmBTU"), measured in accordance with this Consent Decree.

16. "EPA" means the United States Environmental Protection Agency.

17. "ESP" means electrostatic precipitator, a pollution control device for the reduction of particulate matter ("PM").

18. "Existing Units" means those Units included in the Wisconsin Electric System.

19. "Flue gas desulfurization system," or "FGD," means a pollution control device that employs flue gas desulfurization technology for the reduction of sulfur dioxide.

20. "Fossil fuel" means any hydrocarbon fuel, including coal, petroleum oil, or natural gas.

21. "Improved Unit" means, in the case of $NO_x$, a Wisconsin Electric System Unit scheduled under this Decree to be equipped with SCR (or equivalent NOx control technology approved pursuant to Paragraph 59) or to be retired, and, in the case of $SO_2$, a Wisconsin Electric

8

System Unit scheduled under this Decree to be equipped with an FGD (or equivalent $SO_2$ control technology approved pursuant to Paragraph 74) or to be retired. A Unit may be an Improved Unit for one pollutant without being an Improved Unit for the other.

22. "lb/mmBTU" mean one pound of a pollutant per million British Thermal Units of heat input.

23. "Malfunction" means malfunction as that term is defined under 40 C.F.R.§ 60.2.

24. "MW" means a megawatt, or one million Watts.

25. "MDEQ" means the Michigan Department of Environmental Quality

26. "National Ambient Air Quality Standards" means national air quality standards promulgated pursuant to Section 109 of the Act, 42 U.S.C. § 7409.

27. "New Units" means any coal-fired or natural gas fired units that commence operation after entry of this Consent Decree, including but not limited to the re-powered natural gas units at the Port Washington Generating Station.

28. "$NO_x$" means oxides of nitrogen, as measured in accordance with the provisions of this Consent Decree.

29. "Nonattainment NSR" means the nonattainment area New Source Review program within the meaning of Part D of Subchapter I of the Act, 42 U.S.C. §§ 7510-7515, 40 C.F.R. Part 51.

30. "NSPS" means New Source Performance Standards within the meaning of Part A of Subchapter I, of the Clean Air Act, 42 U.S.C. § 7411, 40 C.F.R. Part 60.

31. "Operating Day" means any calendar day on which a Unit fires fossil fuel.

9

32. "Other Unit" means any Unit of the Wisconsin Electric System that is not an Improved Unit for the pollutant in question. A Unit may be an Improved Unit for NOx and an Other Unit for $SO_2$ and vice versa.

33. "PM Control Device" means an electrostatic precipitator ("ESP") or a baghouse ("BH"), devices which reduce emissions of particulate matter ("PM").

34. "Part 55 of NREPA" means Part 55, Air Pollution Control, of Michigan's Natural Resources and Environmental Protection Act, MCL §§ 324.5501-42.

35. "Parties" means Wisconsin Electric, the State of Michigan and the United States.

36. "Permitting State" means the state in which a particular Unit is located from which Wisconsin Electric is required to obtain permits, licenses, or approvals in order to install or operate a source of air pollution.

37. "Plaintiffs" means the United States and the State of Michigan.

38. "Plant-specific 12-Month Rolling Tonnage" means the sum of the tons of pollutant in question emitted from the applicable plant in the most recent month and the previous eleven (11) months. A new Plant-Specific 12-Month Rolling Tonnage will be calculated for each new complete month.

39. "PM" means particulate matter, as measured in accordance with the provisions of this Consent Decree.

40. "PM CEMS" or "PM continuous emission monitoring system" means equipment that samples, analyzes, measures, and provides PM emissions data -- by readings taken at frequent intervals – and makes an electronic or paper record of the PM emissions measured.

10

41. "PM Emission Rate" shall mean the average number of pounds of PM emitted per million BTU of heat input ("lb/mmBTU"), as measured in annual stack tests, in accordance with the reference methods set forth in 40 C.F.R. Part 60, Appendix A, Method 5 or Method 17.

42. "Project Dollars" means Wisconsin Electric's expenditures and payments incurred or made in carrying out the projects identified in Section IX of this Consent Decree (Environmental Projects) to the extent that such expenditures or payments both: (a) comply with the Project Dollar and other requirements set by this Consent Decree in Section IX of this Consent Decree (Environmental Projects); and (b) constitute Wisconsin Electric's external costs for contractors, vendors, and equipment, and its internal costs consisting of employee time, travel, and other out-of-pocket expenses specifically attributable to these particular projects and documented in accordance with "GAAP".

43. "PSD" means Prevention of Significant Deterioration within the meaning of Part C of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470 - 7492 and 40 C.F.R. Part 52.

44. "SCR" means a device that employs selective catalytic reduction technology for the reduction of nitrogen oxides.

45. "$SO_2$" means sulfur dioxide, as measured in accordance with this Consent Decree.

46. "$SO_2$ Allowance" means an "allowance," as defined at 42 U.S.C. § 7651a(3): an authorization, allocated to an affected unit, by the Administrator of EPA under Subchapter IV of the Act, to emit, during or after a specified calendar year, one ton of sulfur dioxide.

47. "State of Michigan" means Michael A. Cox, Attorney General of the State of Michigan, ex rel. Michigan Department of Environmental Quality.

11

48. "System-wide 12-Month Rolling Average Emission Rate" means (a) summing the pounds of pollutant in question emitted from the Wisconsin Electric System during the most recent complete month and the previous eleven (11) months, (b) summing the heat input to the Wisconsin Electric System in mmBTU during the most recent complete month and the previous eleven (11) months, and (c) dividing the total number of pounds of pollutants emitted during the twelve (12) months by the total heat input during the twelve (12) months, and expressing the resulting figure in lbs/mmBTU. A new System-wide 12-Month Rolling Average Emission Rate shall be calculated for each new complete month. Each "System-wide 12-Month Rolling Average Emission Rate" shall include all start-up, shut down and Malfunction periods within each complete month.

49. "System-wide 12-Month Rolling Tonnage" means the sum of the tons of pollutant in question emitted from the Wisconsin Electric System in the most recent month and the previous eleven (11) months. A new System-wide 12-Month Rolling Tonnage will be calculated for each new complete month.

50. "Title V Permit" means the permit required of Wisconsin Electric's major sources under Subchapter V of the Clean Air Act, 42 U.S.C. §§ 7661-7661e.

51. "Unit" means, for the purpose of this Consent Decree, collectively, the coal pulverizer, the stationary equipment that feeds coal to the boiler, the boiler that produces steam for the steam turbine, the steam turbine, the generator, the equipment necessary to operate the generator, steam turbine and boiler, and all ancillary equipment, including pollution control equipment, or systems necessary for the production of electricity. An electric utility steam generating station may be comprised of one or more Units.

12

52. "Unit-Specific 12-Month Rolling Tonnage" means the sum of the tons of pollutant in question emitted from the applicable Unit in the most recent month and the previous eleven (11) months. A new Unit-Specific 12-Month Rolling Tonnage will be calculated for each new complete month.

53. "WEC" means Wisconsin Energy Corporation, the parent company of Wisconsin Electric and W.E. Power.

54. "W.E. Power" means W.E. Power LLC, a subsidiary of WEC and an affiliate of Wisconsin Electric.

55. "Wisconsin Electric" means the Wisconsin Electric Power Company.

56. "Wisconsin Electric System" means, solely for purposes of this Consent Decree, the following twenty-three (23) coal-fired, electric utility steam generating Units (with the rated $MW_{(net)}$ capacity of each Unit noted in parentheses):

- Presque Isle Generating Station in Marquette, Michigan - Unit 1 (25 MW), 2 (37.5 MW), 3 (54.4 MW), 4 (57.8 MW), 5 (90 MW), 6 (90 MW), 7 (90 MW), 8 (90 MW), and 9 (90 MW);

- Pleasant Prairie Generating Station in Kenosha, Wisconsin - Units 1 (616.6 MW) and 2 (616.6 MW);

- South Oak Creek Generating Station in Oak Creek, Wisconsin - Units 5 (275 MW), 6 (275 MW), 7 (317.6 MW), and 8 (324 MW);

- Port Washington Generating Station in Port Washington, Wisconsin - Units 1 (80 MW), 2 (80 MW), 3 (80 MW), and 4 (80 MW);

13

- Valley Generating Station in Milwaukee, Wisconsin - Units 1 (80 MW), 2 (80 MW), 3 (80 MW), and 4 (80 MW).

## IV. UNITS TO BE CONTROLLED OR RETIRED

57.     Wisconsin Electric shall either satisfy the emission control requirements of Paragraphs 58 and 73 with regard to the following Units or retire and permanently cease to operate the following Units within the Wisconsin Electric System by the following dates:

| Unit | Date by which Wisconsin Electric Must Control or Cease to Operate Unit |
|------|------|
| Port Washington Unit 4 | Upon Entry of this Consent Decree |
| Port Washington Unit 1 | December 31, 2004 |
| Port Washington Unit 2 | December 31, 2004 |
| Port Washington Unit 3 | December 31, 2004 |
| Oak Creek Unit 5 | December 31, 2012 |
| Oak Creek Unit 6 | December 31, 2012 |
| Presque Isle Unit 1 | December 31, 2012 |
| Presque Isle Unit 2 | December 31, 2012 |
| Presque Isle Unit 3 | December 31, 2012 |
| Presque Isle Unit 4 | December 31, 2012 |

14

## V. NO<sub>x</sub> EMISSION REDUCTIONS AND CONTROLS

### A. NO<sub>x</sub> Emission Controls

58.     Wisconsin Electric shall install and commence continuous operation of Selective

Catalytic Reduction technology ("SCR") (or equivalent $NO_x$ control technology approved

pursuant to Paragraph 59) so as to achieve a 30-Day Rolling Average Emission Rate not greater

than 0.100 lb/mmBTU $NO_x$ on the following Units within the Wisconsin Electric System by the

dates set forth in the following table.

| Unit | Date by Which Wisconsin Electric Must Complete Installation and Continuously Operate SCR | Date by Which Wisconsin Electric Must Comply with the 30-Day Rolling Average Emission Rate |
|---|---|---|
| Pleasant Prairie Unit 2 | December 31, 2003 | January 30, 2004 |
| Pleasant Prairie Unit 1 | December 31, 2006 | January 30, 2007 |
| Oak Creek Unit 7 | December 31, 2012 | January 30, 2013 |
| Oak Creek Unit 8 | December 31, 2012 | January 30, 2013 |

59.     With prior written notice to and approval from EPA, Wisconsin Electric may, in

lieu of installing and operating any such SCR, install and operate equivalent $NO_x$ control

technology so long as such equivalent $NO_x$ control technology achieves a 30-Day Rolling

Average Emission Rate not greater than 0.100 lb/mmBTU $NO_x$.

60.     Wisconsin Electric shall continuously operate SCR (or equivalent NOx control

technology approved pursuant to Paragraph 59) at all times that the Unit it serves is in operation

consistent with the technological limitations, manufacturers' specifications, and good operating

practices, for the SCR or equivalent technology.

15

61.     Wisconsin Electric shall also operate either low $NO_x$ burners ("LNB") or combustion control technology on the following Units within the Wisconsin Electric System. Such low-$NO_x$ burner or combustion control technology shall be operational in accordance with the following schedule:

16

| Units to be Controlled | NO$_x$ Control | Deadline for Commencement of Operation |
|---|---|---|
| Valley Boiler 1 | LNB and Combustion Optimization Software (Existing LNB and Combustion Optimization Software) | 30 days after the date of lodging of this Consent Decree |
| Valley Boiler 2 | LNB and Combustion Optimization Software (Existing LNB and Combustion Optimization Software) | 30 days after the date of lodging of this Consent Decree |
| Valley Boiler 3 | LNB and Combustion Optimization Software (Existing LNB and Combustion Optimization Software) | 30 days after the date of lodging of this Consent Decree |
| Valley Boiler 4 | LNB and Combustion Optimization Software (Existing LNB and Combustion Optimization Software) | 30 days after the date of lodging of this Consent Decree |
| Presque Isle Unit 5 | LNB and Combustion Optimization Software | December 31, 2003 |
| Presque Isle Unit 6 | LNB and Combustion Optimization Software | December 31, 2003 |
| Presque Isle Unit 7 | LNB and Combustion Optimization Software (Existing LNB) | December 31, 2005 |
| Presque Isle Unit 8 | LNB and Combustion Optimization Software (Existing LNB) | December 31, 2005 |
| Presque Isle Unit 9 | LNB and Combustion Optimization Software (Existing LNB) | December 31, 2006 |

17

B. System-Wide NO$_x$ Emission Limits

62.    Wisconsin Electric shall not exceed the Wisconsin Electric System-wide 12-Month Rolling Average Emission Rates for NO$_x$ as specified below.

| For the 12-Month Period Commencing on the Date Specified Below, and Each 12-Month Period Thereafter: | System-wide 12-Month Rolling Average Emission Rate for NO$_x$ |
|---|---|
| January 1, 2005 | 0.270 lbs/mmBTU |
| January 1, 2007 | 0.190 lbs/mmBTU |
| January 1, 2013 | 0.170 lbs/mmBTU |

63.    In addition to meeting the system-wide emission limit set forth in the preceding Paragraph, Wisconsin Electric shall not emit NO$_x$ on a System-wide 12-Month Rolling Tonnage basis from the Wisconsin Electric System in an amount greater than the following number of tons.

| For the 12-Month Period Commencing on the Date Specified Below, and Each 12-Month Period Thereafter: | System-wide 12-Month Rolling Tonnage Limitation for NO$_x$ |
|---|---|
| January 1, 2005 | 31,500 tons |
| January 1, 2007 | 23,400 tons |
| January 1, 2013 | 17,400 tons |

18

Wisconsin Electric shall meet the above $NO_x$ tonnage limitations exclusively through the operation of all control equipment required to be installed and operated by this Decree, Unit retirements, and any additional control equipment that Wisconsin Electric installs and operates. Wisconsin Electric shall not use $NO_x$ allowances or credits to comply with these limitations.

C. NOx Emission Limitations at Presque Isle Units 1 and 2

64. In addition to meeting the System-wide 12-Month Rolling Tonnage limitations for $NO_x$ set forth in Paragraph 63, after December 31, 2003, Wisconsin Electric shall not emit $NO_x$ from the Units 1 and 2 at the Presque Isle Generating Plant in an amount greater than 130 and 194 tons per year, respectively, based upon a Unit-Specific 12-Month Rolling Tonnage. If a Unit exceeds the applicable Unit-Specific 12-Month Rolling Tonnage limitation specified in this Paragraph, Wisconsin Electric shall install and operate LNB technologies on that Unit no later than December 31 of the calendar year following such exceedance.

65. So long as Units 1 through 4 at the Presque Isle Generating Station discharge through a common stack, are of the same design and combust the same fuel, Wisconsin Electric shall determine monthly mass emissions of $NO_x$ by apportioning $NO_x$ emissions from the common stack to Units 1 and 2. To apportion emissions, Wisconsin Electric shall utilize the load based apportionment protocol used in the Acid Rain Program to apportion heat rates to units that share a common stack. Each month, Wisconsin Electric shall calculate the Unit-Specific 12-month Rolling Tonnage of $NO_x$ mass (tons/year) attributed to Units 1 and 2.

D. Use of $NO_x$ Emission Allowances

66. For any and all actions taken by Wisconsin Electric to conform to the requirements of this Consent Decree, Wisconsin Electric shall not use, sell, or trade any resulting

19

NO$_x$ emission allowances or credits in any emission trading or marketing program of any kind, except as provided in this Consent Decree.

67.     NO$_x$ emission allowances or credits allocated to the Wisconsin Electric System by the Administrator of EPA under the Act, or by any State under its State Implementation Plan, may be used by Wisconsin Electric to meet its own federal and/or state Clean Air Act regulatory requirements for any Existing Unit or New Unit owned or operated, in whole or in part, by Wisconsin Electric.

68.     Nothing in this Consent Decree shall preclude Wisconsin Electric from using, selling, or transferring NO$_x$ emission reductions below the emission requirements of Wi. Admin. Code NR 428 among the units in the Wisconsin Electric System in order to demonstrate compliance with either Wi. Admin. Code NR 428 or Mich. Admin. Code Rule 801. Use of emission reductions generated from the Wisconsin Electric System to comply with the requirements of Mich. Admin. Code Rule 801 will conform to the Memorandum of Understanding ("MOU") among the State of Wisconsin, the State of Michigan and Wisconsin Electric, dated November 8, 2002, as that MOU may be amended from time to time.

69.     Nothing in this Consent Decree shall preclude Wisconsin Electric from using, selling or transferring excess NO$_x$ emission allowances or credits that may arise as a result of:

   a.     activities which occur prior to the date of entry of this Consent Decree;

   b.     achieving NO$_x$ emission reductions at an Improved Unit that are below both the 30-Day Rolling Average Emission Rate of 0.100 lb/mmBTU NO$_x$ and the System-wide 12-Month Rolling Tonnage limitations set forth in this Consent Decree; or

20

c.   the $NO_x$ emission reductions achieved by virtue of Wisconsin Electric's installation and operation any $NO_x$ pollution controls prior to the dates required under Section V ($NO_x$ Emission Reductions and Controls) of this Consent Decree,

so long as Wisconsin Electric timely reports the creation of such allowances or credits in accordance with Section XII of this Consent Decree. For purposes of this Paragraph, excess $NO_x$ emission allowances or credits equal the number of tons of $NO_x$ that Wisconsin Electric removed from its emissions that are in excess of the $NO_x$ reductions required by this Decree.

70.   Wisconsin Electric may not purchase or otherwise obtain $NO_x$ allowances or credits from another source for purposes of complying with the requirements of this Consent Decree. However, nothing in this Consent Decree shall prevent Wisconsin Electric from purchasing or otherwise obtaining $NO_x$ allowances or credits from another source for purposes of complying with state or federal Clean Air Act requirements to the extent otherwise allowed by law.

E.   General $NO_x$ Provisions

71.   In determining Emission Rates for $NO_x$, Wisconsin Electric shall use CEMS in accordance with those reference methods specified in 40 C.F.R. Part 75.

72.   In calculating the 30-day Rolling Average Emission Rate or System-wide 12-Month Rolling Average Emission Rate for $NO_x$ for a given Unit or group of Units, Wisconsin Electric shall not exclude any period of time that the Unit(s) is/are in operation, including periods in which any $NO_x$ emission control technology for the Unit(s) is not in operation.

21

## VI. SO₂ EMISSION REDUCTIONS AND CONTROLS

### A. SO₂ Emission Controls

#### 1. New FGD Installations

73.     Wisconsin Electric shall install and commence continuous operation of Flue Gas Desulfurization technology ("FGD") (or equivalent $SO_2$ control technology approved pursuant to Paragraph 74) so as to achieve either a 30-Day Rolling Average Emission Rate of not greater than 0.100 lb/mmBTU $SO_2$ or a 30-day Rolling Average $SO_2$ Removal Efficiency of at least 95 percent on the following Units within the Wisconsin Electric System by the dates specified below.

| Unit | Date by which Wisconsin Electric Must Complete Installation and Continuously Operate FGD | Date by which Wisconsin Electric Must Comply with 30-Day Rolling Average Emission Rate |
|---|---|---|
| Pleasant Prairie Unit 1 | December 31, 2006 | January 30, 2007 |
| Pleasant Prairie Unit 2 | December 31, 2007 | January 30, 2008 |
| Oak Creek Unit 7 | December 31, 2012 | January 30, 2013 |
| Oak Creek Unit 8 | December 31, 2012 | January 30, 2013 |

74.     In lieu of installing and operating such FGDs, Wisconsin Electric may, with prior written notice to and approval from EPA, install and operate equivalent $SO_2$ control technology, so long as such equivalent $SO_2$ control technology achieves a 30-Day Rolling Average Emission Rate of not greater than 0.100 lb/mmBTU $SO_2$ or a 30-day Rolling Average Removal Efficiency of at least 95 percent.

75.     Wisconsin Electric shall continuously operate each FGD (or equivalent $SO_2$ control technology approved pursuant to Paragraph 74) in the Wisconsin Electric System at all

22

times that the Unit it serves is in operation, except that, following startup of the Unit, Wisconsin Electric need not operate such control technology until the Unit is fired with any coal. Wisconsin Electric shall use good operating practices at all times that the Unit is in operation.

B. System-Wide $SO_2$ Emission Limits

76.     Wisconsin Electric shall not exceed the Wisconsin Electric System-Wide 12-Month Rolling Average Emission Rates for $SO_2$ as specified below.

| For the 12-Month Period Commencing on the Date Specified Below, and Each 12-Month Period Thereafter: | System-wide 12-Month Rolling Average Emission Rate for $SO_2$ |
|---|---|
| January 1, 2005 | 0.76 lbs/mmBTU |
| January 1, 2007 | 0.61 lbs/mmBTU |
| January 1, 2008 | 0.45 lbs/mmBTU |
| January 1, 2013 | 0.32 lbs/mmBTU |

77.     In addition to installing the controls, retiring Units, achieving the $SO_2$ Emission Rates or Removal Efficiencies described in Paragraph 73, and surrendering the $SO_2$ Allowances required in this Consent Decree, Wisconsin Electric shall not emit $SO_2$ on a System-wide 12-Month Rolling Tonnage basis from the Wisconsin Electric System in an amount greater than the following number of tons.

23

| For the 12-Month Period Commencing on the Date Specified Below, and Each 12-Month Period Thereafter: | System-wide 12-Month Rolling Tonnage Limit for $SO_2$ |
|---|---|
| January 1, 2005 | 86,900 tons |
| January 1, 2007 | 74,400 tons |
| January 1, 2008 | 55,400 tons |
| January 1, 2013 | 33,300 tons |

Wisconsin Electric shall meet the above $SO_2$ tonnage limitations exclusively through the operation of all control equipment required to be installed and operated by this Decree, Unit retirements, and any additional control equipment that Wisconsin Electric installs and operates. Wisconsin Electric shall not use $SO_2$ allowances or credits to comply with these limitations.

### C. Surrender of $SO_2$ Allowances

78.     For purposes of this Subsection, the "surrender of allowances" means permanently surrendering allowances from the accounts administered by EPA for all units in the Wisconsin Electric System, so that such allowances can never be used to meet any compliance requirement under the Clean Air Act, the Michigan or Wisconsin State Implementation Plans, or this Consent Decree.

79.     Beginning on January 1, 2004, Wisconsin Electric may use any $SO_2$ Allowances allocated by EPA to the Wisconsin Electric System only to satisfy the operational needs of Existing Units or New Units.  Wisconsin Electric shall not sell or transfer any allocated $SO_2$ Allowances to a third party, except as provided in Paragraphs 80, 81 and 84 below.  However, for the calendar years 2004 through 2007, Wisconsin Electric may bank $SO_2$ allowances allocated by

24

EPA to the Units in the Wisconsin Electric System for use at the Existing Units or New Units during the years 2004 through 2007.

80.     For each calendar year, beginning with calendar year 2007, Wisconsin Electric shall surrender to EPA, or transfer to a non-profit third party selected by Wisconsin Electric for surrender, any $SO_2$ Allowances that exceed the operational needs of the Existing Units and New Units for $SO_2$ Allowances, collectively. Surrender shall occur annually thereafter and within 45 days of Wisconsin Electric's receipt from EPA of the Annual Deduction Reports for $SO_2$. In addition, in calendar year 2008, Wisconsin Electric shall surrender any allowances allocated by EPA to the Units in the Wisconsin Electric System that were banked and not used during the years 2004 through 2007. Wisconsin Electric shall surrender $SO_2$ Allowances by the use of applicable United States Environmental Protection Agency Acid Rain Program Allowance Transfer Form.

81.     If any allowances are transferred directly to a third party, Wisconsin Electric shall include a description of such transfer in the next report submitted to the Plaintiffs pursuant to Section XII (Periodic Reporting) of this Consent Decree. Such report shall: (i) provide the identity of the non-profit third-party recipient(s) of the $SO_2$ Allowances and a listing of the serial numbers of the transferred $SO_2$ Allowances; and (ii) include a certification by the third-party recipient(s) stating that the recipient will not sell, trade, or otherwise exchange any of the allowances and will not use any of the $SO_2$ Allowances to meet any obligation imposed by any environmental law. No later than the next Section XII periodic report due 12 months after the first report due after the transfer, Wisconsin Electric shall include in a statement that the third-party recipient(s) surrendered the $SO_2$ Allowances for permanent surrender to EPA within one

25

year after Wisconsin Electric transferred the $SO_2$ Allowances to them. Wisconsin Electric shall not have complied with the $SO_2$ Allowance surrender requirements of this Paragraph until all third-party recipient(s) shall have actually surrendered the transferred $SO_2$ Allowances to EPA.

82.     For all $SO_2$ Allowances surrendered to EPA, Wisconsin Electric shall first submit an $SO_2$ Allowance transfer request form to EPA's Office of Air and Radiation's Clean Air Markets Division directing the transfer of the $SO_2$ Allowances held or controlled by Wisconsin Electric to the EPA Enforcement Surrender Account or to any other EPA account that EPA may direct. As part of submitting these transfer requests, Wisconsin Electric shall irrevocably authorize the transfer of these $SO_2$ Allowances and identify -- by name of account and any applicable serial or other identification numbers or station names -- the source and location of the $SO_2$ Allowances being surrendered.

83.     The requirements in Paragraphs 79 and 80 of this Decree pertaining to Wisconsin Electric's use and retirement of $SO_2$ Allowances are permanent injunctions not subject to any termination provision of this Decree. These provisions shall survive any termination of this Decree in whole or in part.

84.     Notwithstanding the provisions in Paragraph 79 and 80, nothing in this Consent Decree shall preclude Wisconsin Electric from using, banking, selling or transferring excess emission $SO_2$ allowances that may arise as a result of:

a.     activities which occur prior to the date of entry of this Consent Decree;

b.     achieving $SO_2$ emissions at an Improved Unit that are below both the 30-Day Rolling Average Emission Rate of 0.100 lb/mmBTU $SO_2$ and the System-wide 12-Month Rolling Tonnage limitations set forth in this Consent Decree;

26

c.    achieving a 30-Day Rolling Average Removal Efficiency at an Improved Unit greater than 95 percent and achieving emissions below the System-wide 12-Month Rolling Tonnage limitations set forth in this Consent Decree; or

d.    the installation and operation of any $SO_2$ pollution controls prior to the dates required under Section VI ($SO_2$ Emission Reductions and Controls) of this Consent Decree

so long as Wisconsin Electric timely reports such use under Section XII. For purposes of this Paragraph, excess $SO_2$ emission allowances equal the number of tons of $SO_2$ that Wisconsin Electric removed from its emissions that are in excess of the $SO_2$ reductions required by this Decree.

D. Fuel Limitations

85.    Wisconsin Electric shall not burn coal having a sulfur content greater than any amount authorized by regulation or state permit at any Wisconsin Electric System Unit. Upon entry of the Consent Decree, Wisconsin Electric shall not receive petroleum coke at any Unit that is not controlled by an FGD (or equivalent $SO_2$ control technology approved pursuant to Paragraph 74), except that Wisconsin Electric may continue to receive petroleum coke at Presque Isle Units 1 through 6 until June 30, 2006.

E. General $SO_2$ Provisions

86.    In determining Emission Rates for $SO_2$, Wisconsin Electric shall use CEMs in accordance with those reference methods specified in 40 C.F.R. Part 75 and 40 C.F.R. Part 60.

87.    For Units that are required to be equipped with $SO_2$ control equipment and that are subject to the 95% removal provisions, the outlet $SO_2$ Emission Rate and the inlet $SO_2$

27

Emission Rate shall be determined in accordance with 40 C.F.R. § 75.15 (using $SO_2$ CEMS data from both the inlet and outlet of the control device). For Units that are required to meet a 0.100 lb/mmBTU limitation, the $SO_2$ Emission Rate shall be determined only at the outlet of the control equipment in accordance with 40 C.F.R. § 75.15 (using $SO_2$ CEMS data from only the outlet of the control device).

## VII. PM EMISSION REDUCTIONS AND CONTROLS

### A. Optimization of PM Controls

88. Within 45 days of lodging of this Consent Decree and continuing thereafter, Wisconsin Electric shall continuously operate each Particulate Matter Control Device on its Existing Units to maximize PM emission reductions, consistent with the operational and maintenance limitations of the Units. Specifically, Wisconsin Electric shall, at a minimum: (a) energize each section of the ESP for each Unit, regardless of whether that action is needed to comply with opacity limits; (b) maintain the energy or power levels delivered to the ESPs for each Unit to achieve the greatest possible removal of PM; (c) make best efforts to expeditiously repair and return to service transformer-rectifier sets when they fail; and (d) maintain an ongoing bag leak detection and replacement program to assure optimal operation of each BH.

### B. Upgrade of PM Controls

89. Within 365 days of lodging of this Consent Decree, Wisconsin Electric shall operate each of the ESPs and BHs within the Wisconsin Electric System, except Units 5 and 6 at the Presque Isle Generating Station, to achieve and maintain a PM Emission Rate of 0.030 lb/mmBTU. Presque Isle Unit 5 shall achieve and maintain a PM Emission Rate of 0.030

28

lb/mmBTU by June 30, 2005 and Presque Isle Unit 6 shall achieve and maintain a PM Emission Rate of 0.030 lb/mmBTU by June 30, 2006.

90. Wisconsin Electric shall continuously operate each ESP and BH in the Wisconsin Electric System at all times that the Unit it serves is combusting coal. Wisconsin Electric shall use good operating practices at all times that the Unit is combusting coal.

C. PM Monitoring

1. PM Stack Tests

91. Beginning in calendar year 2004, and continuing annually thereafter, Wisconsin Electric shall conduct a performance test on each Wisconsin Electric System Unit. The annual stack test requirement imposed on each Wisconsin Electric System Unit by this Paragraph may be satisfied by Wisconsin Electric's stack tests conducted as required by its permits from the States of Michigan and Wisconsin for any year that such stack tests are required under the permits. Wisconsin Electric may perform biennial rather than annual testing provided that (a) two of the most recently completed test results from tests conducted in accordance with Method 5 or Method 17 demonstrate that the particulate matter emissions are equal to or less than a 0.015 lb/mmBTU emission limitation, or (b) the Unit is equipped with a PM CEMS in accordance with Paragraph 96. Wisconsin Electric shall perform annual rather that biennial testing the year immediately following any test result demonstrating that the particulate matter emissions are greater than a 0.015 lb/mmBTU emission limitation.

92. The reference and monitoring methods and procedures for determining compliance with Emission Rates for PM shall be those specified in 40 C.F.R. Part 60, Appendix A, Method 5 or Method 17. Use of any particular method shall conform to the EPA requirements

29

specified in 40 C.F.R. Part 60, Appendix A and 40 C.F.R. § 60.48a (b) and (e), or any federally approved SIP method. Wisconsin Electric shall calculate the PM Emission Rates from the stack test results in accordance with 40 C.F.R. § 60.8(f), and 40 C.F.R. § 60.46a(c). The results of each PM stack test shall be submitted to EPA within 45 days of completion of each test. PM stack tests of the Units at the Presque Isle Generating Station shall also be submitted to the MDEQ within 45 days of completion of each test.

93. The PM Emission Rates established under Paragraph 89 of this Section shall not apply during periods of startup and shutdown or during periods of control equipment or Unit Malfunction, if the Malfunction meets the requirements of the Force Majeure section of this Consent Decree. Periods of startup shall not exceed two hours after any amount of coal is combusted. Periods of shutdown shall only commence when the Unit ceases burning any amount of coal.

## 2. PM CEMS

94. Wisconsin Electric shall undertake a program to install and operate Continuous Emission Monitoring System for Particulate Matter ("PM CEMS"). Each PM CEMS shall be comprised of a continuous particle mass monitor measuring particulate matter concentration, directly or indirectly, on an hourly average basis and a diluent monitor used to convert results to units of lb/mmBTU. Wisconsin Electric shall maintain, in an electronic database, the hourly average emission values of all PM CEMS in lb/mmBTU. Wisconsin Electric shall use reasonable efforts to keep each PM CEMS running and producing data whenever any Unit served by the PM CEMS is operating.

30

95.    No later than one year prior to the deadline to commence operation as set forth in
Paragraph 96, Wisconsin Electric shall submit to EPA for review and approval a plan for the
installation and certification of each PM CEMS.

96.    Wisconsin Electric shall install, certify, and operate PM CEMS on 10 Units,
stacks or common stacks in accordance with the following schedule:

| Unit | Deadline to Commence Operation | Location |
|------|-------------------------------|----------|
| Presque Isle Units 1-4 | April 1, 2006 | Common Outlet Flue at Stack |
| Presque Isle Unit 5 | April 1, 2006 | Stack |
| Presque Isle Unit 6 | April 1, 2006 | Stack |
| Presque Isle Units 7-9 | April 1, 2006 | Common Outlet Duct of TOXECON |
| Oak Creek Units 5&6 | April 1, 2005 | Common Stack |
| Oak Creek Unit 7 | April 1, 2005 | Precipitator Outlet Duct |
| Oak Creek Unit 8 | April 1, 2005 | Precipitator Outlet Duct |
| Pleasant Prairie Units 1&2 | April 1, 2005 | Common Stack |
| Valley Unit 1 | April 1, 2006 | Common Stack |
| Valley Unit 2 | April 1, 2006 | Common Stack |

97.    Notwithstanding the requirements of Paragraph 96, by April 1, 2005, Wisconsin
Electric may install two mercury CEMS, one of which will be installed at Pleasant Prairie Unit 1
or Unit 2, and one of which will be installed at Oak Creek Unit 7 or 8, in lieu of a PM
CEMS on Presque Isle Units 1 through 4 and one of the units at Valley.

31

98. No later than 120 days prior to the deadline to commence operation of each PM CEMS, Wisconsin Electric shall submit to EPA for approval pursuant to Section XIII (Review and Approval of Submittals) a proposed Quality Assurance/Quality Control ("QA/QC") protocol that shall be followed in calibrating such PM CEMS. Following EPA's approval of the protocol, Wisconsin Electric shall thereafter operate each PM CEMS in accordance with the approved protocol.

99. In developing both the plan for installation and certification of the PM CEMS and the QA/QC protocol, Wisconsin Electric may use the criteria set forth in EPA's proposed revisions to Performance Specification 11: Specification and Test Procedures for PM CEMS and Procedure 2: PM CEMS at Stationary Sources (PS 11), as published at 66 Fed. Reg 64176 (December 12, 2001) or other available PM CEMS guidance.

100. No later than 90 days after Wisconsin Electric begins operation of the PM CEMS, Wisconsin Electric shall conduct tests of each PM CEMS to demonstrate compliance with the PM CEMS plan submitted to and approved by EPA in accordance with Paragraph 95.

101. If after Wisconsin Electric operates the PM CEMS for at least two years, and if the Parties then agree that it is infeasible to continue operating PM CEMS, Wisconsin Electric shall submit an alternative PM monitoring plan for review and approval by EPA. The plan shall include an explanation of the basis for stopping operation of the PM CEMS and a proposal for an alternative monitoring protocol. Until EPA approves such plan, Wisconsin Electric shall continue to operate the PM CEMS.

102. Operation of a PM CEMS shall be considered "infeasible" if (a) the PM CEMS cannot be kept in proper condition for sufficient periods of time to produce reliable, adequate, or

32

useful data consistent with the QA/QC protocol; or (b) Wisconsin Electric demonstrates that recurring, chronic, or unusual equipment adjustment or servicing needs in relation to other types of continuous emission monitors cannot be resolved through reasonable expenditures of resources. If the United States determines that Wisconsin Electric has demonstrated infeasibility pursuant to this Paragraph, Wisconsin Electric shall be entitled to discontinue operation of and remove the PM CEMS.

### 3. PM Reporting

103.     Following the installation of each PM CEMS, Wisconsin Electric shall begin and continue to report to EPA, pursuant to Section XII, the data recorded by the PM CEMS, expressed in lb/mmBTU on a 3-hour, 24-hour, 30-day, and 365-day rolling average basis in electronic format, as required in Paragraph 94. For the PM CEMS installed at the Presque Isle Generating Station, the above data also shall be reported to the MDEQ.

### D. General PM Provisions

104.     In determining the PM Emission Rate, Wisconsin Electric shall use the reference methods specified in 40 C.F.R. Part 60, Appendix A, Method 5 or Method 17, using stack tests, or alternative methods that are either promulgated by EPA or requested by Wisconsin Electric and approved by EPA. Wisconsin Electric shall also calculate the PM Emission Rates from annual (or biennial) stack tests in accordance with 40 C.F.R. § 60.8(f). Wisconsin Electric shall also determine PM Emission Rates using PM CEMS consistent with the approved QA/QC protocol.

105.     Data from the PM CEMS shall be used by Wisconsin Electric, at a minimum, to monitor progress in reducing PM emissions. Nothing in this Consent Decree is intended to, or

33

shall, alter or waive any applicable law (including any defenses, entitlements, challenges, or clarifications related to the Credible Evidence Rule, 62 Fed. Reg. 8315 (Feb. 27, 1997)) concerning the use of data for any purpose under the Act, generated either by the reference methods specified herein or otherwise.

## VIII. PROHIBITION ON NETTING CREDITS OR OFFSETS FROM REQUIRED CONTROLS

106.     For any and all actions taken by Wisconsin Electric to comply with the requirements of this Consent Decree, including but not limited to the upgrade of ESPs and BHs, the installation of FGDs, SCRs, or equivalent control devices approved under this Consent Decree, the re-powering of certain units, the retirement of certain units, and the reduction of emissions to satisfy annual emission tonnage limitations, any emission reductions generated shall not be considered as a creditable contemporaneous emission decrease for the purpose of obtaining a netting credit under the Clean Air Act's Nonattainment NSR and PSD programs. Notwithstanding the preceding sentence, Wisconsin Electric may use any creditable contemporaneous emission decreases of Volatile Organic Compounds ("VOCs") generated under this Consent Decree for the purpose of obtaining a netting credit for VOCs under the Clean Air Act's Nonattainment NSR and PSD programs.

107.     Nothing in this Consent Decree is intended to preclude the emission reductions generated under this Decree from being considered by the State of Michigan and EPA as creditable contemporaneous emission decreases for the purpose of attainment demonstrations submitted pursuant to § 110 of the Act, 42 U.S.C. § 7410, or in determining impacts on NAAQS and PSD increment consumption.

34

## IX. ENVIRONMENTAL PROJECTS

108.    Wisconsin Electric, in cooperation with the United States Department of Energy ("DOE") and potentially other parties, shall design, construct, operate and analyze the first full scale TOXECON with activated carbon injection with the goal of achieving a 90% removal of all species of mercury ("the TOXECON Project").    The TOXECON Project will be implemented at Units 7, 8, and 9 of Wisconsin Electric's Presque Isle Generating Station.

109.    At least six months before it plans to commence implementation of the TOXECON Project, Wisconsin Electric shall submit to the Plaintiffs for review and approval pursuant to Section XIII of this Consent Decree a plan for the implementation of the TOXECON Project, including the date by which Wisconsin Electric will commence design and construction of the Project, and the date by which Wisconsin Electric will complete the Project. To the extent that any change to the TOXECON Project may be required, Wisconsin Electric shall notify the Plaintiffs of such change within 60 days of becoming aware a change is necessary. Wisconsin Electric shall implement the TOXECON Project in compliance with the schedules and terms of this Consent Decree and the plans for such Project approved under this Decree.

110.    For purposes of this Consent Decree, in performing the TOXECON Project, Wisconsin Electric shall, prior to December 31, 2006, spend no less than $20 million, and shall not be required to spend more than $25 million, in Project Dollars (measured in calendar year 2003 constant dollars). Wisconsin Electric shall maintain all documents required by Generally Accepted Accounting Principles to substantiate the Project Dollars spent by Wisconsin Electric, and shall provide copies of these documents to the Plaintiffs within 30 days of a request by one or more of the Plaintiffs for these documents.

35

111.     All plans and reports prepared by Wisconsin Electric pursuant to the requirements of this Section in this Consent Decree shall be publicly available without charge, subject to the limitations contained in Paragraph 179.

112.     Wisconsin Electric shall certify, as part of each plan submitted to the Plaintiffs for any Project, that it is unaware of any person required by law, other than this Consent Decree, to perform the Project described in the plan.

113.     Wisconsin Electric shall use good faith efforts to secure as much benefit as possible for the Project Dollars expended, consistent with the applicable requirements and limits of this Consent Decree.

114.     Within 60 days following the completion of the TOXECON Project, Wisconsin Electric shall submit to the EPA and the MDEQ a report that documents the date that the Project was completed, Wisconsin Electric's results of implementing the Project, including the emission reductions or other environmental benefits achieved, and the Project Dollars expended by Wisconsin Electric in implementing the Project.

115.     Following completion of the TOXECON Project, Wisconsin Electric shall maintain the baghouse component of the TOXECON in the flue gas stream regardless of the results of the demonstration project. If Wisconsin Electric determines that the demonstration project has removed reasonable levels of mercury and is operationally viable, Wisconsin Electric shall also continue sorbent injection for mercury control.

116.     Wisconsin Electric shall not financially benefit from the sale or transfer of the TOXECON technology or the collection or distribution of information collected during this demonstration project.

36

117.     Wisconsin Electric shall provide the United States and the MDEQ with semi-annual updates concerning the progress of the TOXECON Project. Wisconsin Electric also shall make information concerning the performance of the TOXECON Project available to the public in an expeditious matter, consistent with DOE's requirements concerning the disclosure of project information and subject to the limitations contained in Paragraph 179. Such information disclosure shall include, but not be limited to, release of periodic progress reports, clearly identifying demonstrated removal efficiencies of mercury and other pollutants, sorbent injection rates and cost effectiveness. In addition, periodic technology transfer open houses and plant tours shall be scheduled, consistent with DOE's requirements for disclosure of project information and subject to the limitations contained in Paragraph 179.

## X. CIVIL PENALTY AND FINE

118.     Within thirty (30) calendar days of entry of this Consent Decree, Wisconsin Electric shall pay to the United States a civil penalty in the amount of $3.1 million. The civil penalty shall be paid by Electronic Funds Transfer ("EFT") to the United States Department of Justice, in accordance with current EFT procedures, referencing USAO File Number 2003V00451 and DOJ Case Number 90-5-2-1-07493 and the civil action case name and case number of this action, with notice given to the Plaintiff, in accordance with Section XX (Notices) of this Consent Decree. The costs of such EFT shall be Wisconsin Electric's responsibility. Payment shall be made in accordance with instructions provided to Wisconsin Electric by the Financial Litigation Unit of the U.S. Attorney's Office for the Eastern District of Wisconsin. Any funds received after 2:00 p.m. EDT shall be credited on the next business day. At the time of payment, Wisconsin Electric shall provide notice of payment, referencing the USAO File

37

Number, DOJ Case Number 90-5-2-1-07493, and the civil action case name and case number, to the Department of Justice and to EPA, as provided in Paragraph 181 (Notice) of this Consent Decree.

119. Failure to timely pay the civil penalty shall subject Wisconsin Electric to interest accruing from the date payment is due until the date payment is made at the rate prescribed by 28 U.S.C. § 1961, and shall render Wisconsin Electric liable for all charges, costs, fees, and penalties established by law for the benefit of a creditor or of the United States in securing payment.

120. Within thirty (30) calendar days of entry of this Consent Decree, Wisconsin Electric shall pay to the State of Michigan a civil fine in the amount of $100,000. Payment shall be made in the form of a certified check or cashier's check, and be payable to the "State of Michigan." Payment shall be sent to the Michigan Department of Environmental Quality, Cashier's Office, P.O. Box 30657, 525 West Allegan Street, Lansing, MI 48909. To ensure proper credit, the check must reference *United States, et. al. v. Wisconsin Electric Power Company*, the Civil Action Number and the Air Quality Division Account Number 1072.

121. To ensure timely payment of the civil fine in Paragraph 120, Wisconsin Electric shall pay interest to the State of Michigan if it fails to make a complete or timely payment to the State of Michigan under this Consent Decree. Pursuant to MCL § 324.6013(6), the interest shall be determined at an annual rate that is equal to one percent (1%) plus the average interest rate paid at auctions of the 5-year United States treasury notes during the six months immediately preceding July 1 and January 1, as certified by the State treasurer, and compounded annually. The interest shall be calculated on the full amount of the civil fine due as principal, calculated

38

from the due date specified in this Consent Decree until the date that the delinquent payment is finally paid in full.

122. Payments made pursuant to this Section are penalties within the meaning of Section 162(f) of the Internal Revenue Code, 26 U.S.C. § 162(f), and are not tax-deductible expenditures for purposes of federal law.

## XI. RESOLUTION OF CLAIMS

### A. RESOLUTION OF CIVIL CLAIMS

123. <u>U.S. Claims Based on Modifications Occurring Before the Lodging of Decree</u>. Entry of this Decree shall resolve all civil claims of the United States under either: (i) Parts C or D of Subchapter I of the Clean Air Act or (ii) 40 C.F.R. Section 60.14, that arose from any modifications that commenced at any Wisconsin Electric System Unit prior to the date of lodging of this Decree, including but not limited to those modifications alleged in the Complaint filed by the United States in this civil action.

124. <u>U.S. Claims Based on Modifications After the Lodging of Decree</u>. Entry of this Decree also shall resolve all civil claims of the United States for pollutants regulated under Parts C or D of Subchapter I of the Clean Air Act, and under regulations promulgated as of the date of lodging of this Decree, where such claims are based on a modification completed before December 31, 2015 and:

(a) commenced at any Wisconsin Electric System Unit after lodging of this Decree; or

(b) that this Consent Decree expressly directs Wisconsin Electric to undertake.

The term "modification" as used in this Paragraph shall have the meaning that term is given under the Clean Air Act statute as it existed on the date of lodging of this Decree.

39

125. <u>Reopener</u>. The resolution of the civil claims of the United States provided by this Subsection is subject to the provisions of Subsection B of this Section.

126. <u>State of Michigan Claims Based on Modifications Occurring Before the Lodging of the Decree.</u> Entry of this Decree shall resolve all civil claims of the State of Michigan under (i) Part C of Subchapter I of the Clean Air Act and (ii) Section 5505 of Part 55 of NREPA, MCL § 324.5505, that arose from any modifications that commenced at any Unit at Wisconsin Electric's Presque Isle Generating Station in Marquette, Michigan prior to the date of lodging of this Decree, including but not limited to those modifications alleged in the Complaint filed by the State of Michigan in this action.

127. <u>State of Michigan Claims Based on Modifications After the Lodging of Decree.</u> Entry of this Decree also shall resolve all civil claims of the State of Michigan for pollutants regulated under (i) Part C of Subchapter I of the Clean Air Act and regulations promulgated as of the date of lodging of this Decree and (ii) Section 5505 of Part 55 of NREPA, MCL § 324.5505, where such claims are based on a modification completed before December 31, 2015 and:

(a) commenced at any Unit at Wisconsin Electric's Presque Isle Generating Plant after lodging of this Decree; or

(b) that this Consent Decree expressly directs Wisconsin Electric to undertake.

The term "modification" as used in this Paragraph shall have the meaning that term is given under the Clean Air Act statute as it existed on the date of lodging of this Decree.

128. <u>Reopener</u>. The resolution of the civil claims of the State of Michigan provided by this Subsection is subject to the provisions of Subsection B of this Section.

B.  PURSUIT OF PLAINTIFFS' CIVIL CLAIMS OTHERWISE RESOLVED

129.  Bases for Pursuing Resolved Claims Across Wisconsin Electric System.
If Wisconsin Electric violates Paragraph 63 (System-wide $NO_x$ Rolling Tonnage Limits),
Paragraph 62 (System-wide $NO_x$ Rolling Average Emission Rate), Paragraph 77 (System-wide
Rolling $SO_2$ Tonnage Limits), Paragraph 76 (System-wide Rolling Average $SO_2$ Emission
Rates), or Paragraph 85 (Fuel Limitation), or fails by more than ninety days to complete
installation and commence operation of any emission control device required pursuant to
Paragraphs 58 or 73; or fails by more than ninety days to control or retire and permanently cease
to operate Wisconsin Electric System Units pursuant to Paragraph 57, then the United States may
pursue any claim at any Wisconsin Electric System Unit that has otherwise been resolved under
Subsection A of this Section, subject to (A) and (B) below, and the State of Michigan may pursue
any claim at any Unit at the Presque Isle Generating Station that has otherwise been resolved
under Subsection A of this Section, subject to (A) and (B) below.

(A)  For any claims based on modifications undertaken at an Other Unit, claims may
be pursued only where the modification(s) on which such claim is based was commenced
within the five years preceding the violation or failure specified in this Paragraph.

(B)  For any claims based on modifications undertaken at an Improved Unit, claims
may be pursued only where the modification(s) on which such claim is based was
commenced (i) after lodging of the Consent Decree and (ii) within the five years
preceding the violation or failure specified in this Paragraph.

130.  Additional Bases for Pursuing Resolved Claims for Modifications at an Improved
Unit.  Solely with respect to Improved Units, the United States may also pursue claims arising

41

from a modification (or collection of modifications) at an Improved Unit that have otherwise been resolved under Section XI, Subsection A, and the State of Michigan may also pursue claims arising from a modification (or collection of modifications) at an Improved Unit at the Presque Isle Generating Station that have otherwise been resolved under Section XI, Subsection A, if the modification (or collection of modifications) at the Improved Unit on which such claim is based (i) was commenced after lodging of this Consent Decree, and (ii) individually (or collectively) increased the maximum hourly emission rate of that Unit for $NO_x$ or $SO_2$ (as measured by 40 C.F.R. § 60.14 (b) and (h)) by more than ten percent (10%).

131.    Additional Bases for Pursuing Resolved Claims for Modifications at an Other Unit. Solely with respect to Other Units, the United States may also pursue claims arising from a modification (or collection of modifications) at an Other Unit that have otherwise been resolved under Section XI, Subsection A, and the State of Michigan may also pursue claims arising from a modification (or collection of modifications) at an Other Unit at the Presque Isle Generating Station that have otherwise been resolved under Section XI, Subsection A, if the modification (or collection of modifications) on which the claim is based was commenced within the five years preceding any of the following events:

(A)    a modification (or collection of modifications) at such Other Unit commenced after lodging of this Consent Decree increases the maximum hourly emission rate for such Other Unit for the relevant pollutant ($NO_x$ or $SO_2$) as measured by 40 C.F.R. § 60.14(b) and (h);

(B)    the aggregate of all Capital Expenditures made at such Other Unit exceed $125/KW on the Unit's Boiler Island (based on the capacity numbers included in Paragraph 56) during any of the following five year periods: January 1, 2006 through December 31, 2010;

42

January 1, 2011 through December 31, 2015. For the period from the date of lodging of this Decree through December 31, 2005, the $125/KW limit shall be pro-rated to include only that portion of the five-year period (January 1, 2000 through December 31, 2005) following the date of lodging of this Decree. (Capital Expenditures shall be measured in calendar year 2002 constant dollars, as adjusted by the McGraw-Hill Engineering News-Record Construction Cost Index); or

(C)     a modification (or collection of modifications) at such Other Unit commenced after lodging of this Consent Decree results in an emissions increase of $NO_x$ and/or $SO_2$ at such Other Unit, and such increase:

> (1)     presents, by itself, or in combination with other emissions or sources, "an imminent and substantial endangerment" within the meaning of Section 303 of the Act, 42 U.S.C. §7603;

> (2)     causes or contributes to violation of a National Ambient Air Quality Standard ("NAAQS") in any Air Quality Control Area that is in attainment with that NAAQS;

> (3)     causes or contributes to violation of a PSD increment; or

> (4)     causes or contributes to any adverse impact on any formally-recognized air quality and related values in any Class I area.

(D)     Solely for purposes of Paragraph 131, Subparagraph (C), the determination of whether there was an emissions increase must take into account any emissions changes relevant to the modeling domain that have occurred or will occur under this Decree at other Wisconsin Electric System Units. In addition, an emissions increase shall be deemed to have occurred at an

43

Other Unit if the annual emissions of the relevant pollutant ($NO_x$ or $SO_2$) from the plant at which such modification(s) occurred exceed the Baseline for that plant.

(E)     The introduction of any new or changed National Ambient Air Quality Standard shall not, standing alone, provide the showing needed under Paragraph 131, Subparagraphs (C)(2) or (C)(3), to pursue any claim for a modification at an Other Unit resolved under Subsection A of this Section.

## XII.  PERIODIC REPORTING

132.     Within 180 days after each date established by this Consent Decree for Wisconsin Electric to achieve and maintain a certain Emission Rate or Removal Efficiency at any Wisconsin Electric System Unit, Wisconsin Electric shall conduct performance tests that demonstrate compliance with the Emission Rate or Removal Efficiency required by this Consent Decree. Within 45 days of each such performance test, Wisconsin Electric shall submit the results of the performance test to EPA at the addresses specified in Section XX (Notices) of this Consent Decree.  For performance tests of the Units at the Presque Isle Generating Station, Wisconsin Electric shall also submit the results to the MDEQ at the addresses specified in Section XX (Notices) of this Consent Decree.

133.     Beginning thirty days after the end of the first full calendar quarter following the entry of this Consent Decree or December 31, 2003, whichever is later, continuing on a semi-annual basis until December 31, 2015, and in addition to any other express reporting requirement in this Consent Decree, Wisconsin Electric shall submit to EPA and the MDEQ a progress report.

134.     The progress report shall contain the following information:

44

> a.    all information necessary to determine compliance with this Consent Decree;
>
> b.    all information relating to emission allowances and credits that Wisconsin Electric claims to have generated in accordance with Paragraphs 69 and 84 by compliance beyond the requirements of this Consent Decree; and
>
> c.    all information indicating that the installation and commencement of operation for a pollution control device may be delayed, including the nature and cause of the delay, and any steps taken by Wisconsin Electric to mitigate such delay.

135.    In any periodic progress report submitted pursuant to this Section, Wisconsin Electric may incorporate by reference information previously submitted under its Title V permitting requirements, provided that Wisconsin Electric attaches the Title V permit report and provides a specific reference to the provisions of the Title V permit report that are responsive to the information sought in the periodic progress report.

136.    In addition to the progress reports required pursuant to this Section, Wisconsin Electric shall provide a written report to EPA of any violation of the requirements of this Consent Decree, including exceedances of required Emission Rates, removal efficiencies, and Unit-Specific and System-wide Rolling Average Emission Rate and Rolling Tonnage limits, within 10 business days of when Wisconsin Electric knew or should have known of any such violation. Wisconsin Electric shall also provide such a written report to the MDEQ of any violation of the System-wide Rolling Average Emission Rate and Rolling Tonnage limits and any Unit-specific requirements applicable to the Units at the Presque Isle Generating Station, within 10 business

45

days of when Wisconsin Electric knew or should have known of any such violation. In this report, Wisconsin Electric shall explain the cause or causes of the violation and all measures taken or to be taken by Wisconsin Electric to prevent such violations in the future.

137. Each Wisconsin Electric report shall be signed by Wisconsin Electric's Vice President Environmental, or, in his or her absence, General Counsel, or higher ranking official, and shall contain the following certification:

> This information was prepared either by me or under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my evaluation, or the directions and my inquiry of the person(s) who manage the system, or the person(s) directly responsible for gathering the information, I hereby certify under penalty of law that, to the best of my knowledge and belief, this information is true, accurate, and complete. I understand that there are significant penalties for submitting false, inaccurate, or incomplete information to the United States.

138. If any allowances are surrendered to any third party pursuant to Section VI.C of this Consent Decree, the third party's certification shall be signed by a managing officer of the third party and shall contain the following language:

> I certify under penalty of law that,_____ [name of third party] will not sell, trade, or otherwise exchange any of the allowances and will not use any of the allowances to meet any obligation imposed by any environmental law. I understand that there are significant penalties for making false, inaccurate, or incomplete information to the United States.

## XIII. REVIEW AND APPROVAL OF SUBMITTALS

139. Wisconsin Electric shall submit and complete each plan, report, or other item to the Plaintiffs whenever such a document is required to be submitted for review or approval pursuant to this Consent Decree. EPA, in consultation with the MDEQ to the extent the report is provided to the MDEQ under this Consent Decree, may approve the submittal or decline to approve it and provide written comments. Within 60 days of receiving written comments from

46

EPA, Wisconsin Electric shall either: (i) alter the submittal consistent with the written comments and provide the revised submittal for final approval to EPA and the MDEQ, to the extent the submittal is provided to MDEQ under this Consent Decree, if called for in this Consent Decree; or (ii) submit the matter for dispute resolution, including the period of informal negotiations, under Section XVI (Dispute Resolution) of this Consent Decree.

140. Upon receipt of the United States' final approval of the submittal and the State of Michigan's final approval, if applicable, or upon completion of the submittal pursuant to dispute resolution, Wisconsin Electric shall implement the submittal in accordance with the approved submittal.

## XIV. STIPULATED PENALTIES

141. For any failure by Wisconsin Electric to comply with the terms of this Consent Decree, and subject to the provisions of Sections XV (Force Majeure) and XVI (Dispute Resolution), Wisconsin Electric shall pay, within 30 days after written demand to Wisconsin Electric by the United States the following stipulated penalties to EPA:

| Consent Decree Violation | Stipulated Penalty (Per day per violation, unless otherwise specified) |
|---|---|
| a. Failure to pay the civil penalty as specified in Section X (Civil Penalty) of this Consent Decree | $10,000 |
| b. Failure to meet any 30-Day Rolling Average Emission Rate, any 30-Day Rolling Average Removal Efficiency, or any other Emission Rate or emission limitation (other than the System-wide 12-month Rolling Average Emission Rates, System-wide 12-month Rolling Tonnage limitations or any other 12-month rolling limitation), where the violation is less than 5% in excess of the limits set forth in this Consent Decree | $2,500 |

47

| | |
|---|---|
| c. Failure to meet any 30-Day Rolling Average Emission Rate, any 30-Day Rolling Average Removal Efficiency, or any other Emission Rate or emission limitation (other than the System-wide 12-month Rolling Average Emission Rates, System-wide 12-month Rolling Tonnage limitations or any other 12-month rolling limitation), where the violation is equal to or greater than 5% but less than 10% in excess of the limits set forth in this Consent Decree | $5,000 |
| d. Failure to meet any 30-Day Rolling Average Emission Rate, any 30-Day Rolling Average Removal Efficiency, or any other Emission Rate or emission limitation (other than the System-wide 12-month Rolling Average Emission Rates, System-wide 12-month Rolling Tonnage limitations or any other 12-month rolling limitation), where the violation is equal to or greater than 10% in excess of the limits set forth in this Consent Decree | $10,000 |
| e. Failure to meet any System-wide 12-month Rolling Average Emission Rate, where the violation is less than 5% in excess of the limits set forth in this Consent Decree | $2,500 per month |
| f. Failure to meet any System-wide 12-month Rolling Average Emission Rate, where the violation is equal to or greater than 5% but less than 10% in excess of the limits set forth in this Consent Decree | $5,000 per month |
| g. Failure to meet any System-wide 12-month Rolling Average Emission Rate, where the violation is equal to or greater than 10% in excess of the limits set forth in this Consent Decree | $10,000 per month |
| h. Failure to meet the System-wide 12-month Rolling $SO_2$ and $NO_x$ Tonnage Limits as set out in Paragraphs 63 and 77 or any other the 12-month rolling tonnage limitation | $5,000 per ton per month for the first 100 tons over the limit, and $10,000 per ton per month for each additional ton over the limit |
| i. Failure to install, commence operation, or continue operation of the $NO_x$, $SO_2$, and PM pollution control devices on any Unit, or failure to retire a Unit | $10,000 during the first 30 days, $27,500 thereafter |
| j. Failure to meet the fuel use limitations at a Unit, as required by Paragraph 85 | $10,000 |

48

| | |
|---|---|
| k. Failure to install or operate CEMS as required in Paragraph 94, subject to Paragraph 102 | $1,000 |
| l. Failure to conduct annual or biennial performance tests of PM emissions, as required in Paragraph 91 | $1,000 |
| m. Failure to apply for the permits required by Paragraphs 172-174 | $1,000 |
| n. Failure to timely submit, modify, or implement, as approved, the reports, plans, studies, analyses, protocols, or other submittals required by this Consent Decree | $750 for the first ten days, $1,000 thereafter. |
| o. Using, selling, or transferring $SO_2$ Allowances, except as permitted by Paragraphs 79, 80 and 84 | (a) three times the market value of the improperly used allowance, as measured at the time of the improper use, plus (b) the surrender, pursuant to the procedures set forth in Paragraphs 79 through 81 of this Decree, of $SO_2$ Allowances in an amount equal to the $SO_2$ Allowances used, sold, or transferred in violation of the Decree |
| p. Using, selling or transferring NOx allowances or credits except as permitted under Paragraph 67-69 | (a) three times the market value of the improperly used allowance, as measured at the time of the improper use, plus (b) the surrender, pursuant to the procedures set forth in Section XII (Periodic Reporting) of this Decree, of $NO_x$ allowances or credits in an amount equal to the $NO_x$ allowances or credits used, sold, or transferred in violation of the Decree |
| q. Failure to surrender an $SO_2$ Allowance in accordance with Paragraph 80 | (a) $27,500 plus (b) $1,000 per $SO_2$ Allowance |
| r. Failure to demonstrate the third-party surrender of an $SO_2$ Allowance in accordance with Paragraph 81 | $2,500 |

49

| s. Failure to undertake and complete any of the Environmental Projects in compliance with Section IX (Environmental Projects) | $1,000 for the first 30 days, $5,000 thereafter |
|---|---|
| t. Any other violation of this Consent Decree | $1,000 |

142.     Violation of an Emission Rate or Removal Efficiency that is based on a 30-Day Rolling Average is a violation on every day on which the average is based. Violation of System-wide 12-Month Rolling Average Emission Rates, System-wide 12-Month Rolling Tonnage Limitations or any other 12-month rolling limitation is a violation each month on which the average is based.

143.     Where a violation of a 30-Day Rolling Average Emission Rate or Removal Efficiency (for the same pollutant and from the same source) recurs within periods less than 30 days, Wisconsin Electric shall not pay a daily stipulated penalty for any day of the recurrence for which a stipulated penalty has already been paid.

144.     All stipulated penalties shall begin to accrue on the day after the performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Consent Decree.

145.     Wisconsin Electric shall pay all stipulated penalties to the United States, in the manner set forth below in Paragraph 147, within 30 days of any violation of this Consent Decree, and shall continue to make such payments every 30 days thereafter until the violation(s) no longer continues, unless Wisconsin Electric elects within 20 days of the violation to dispute the

50

accrual of stipulated penalties in accordance with the provisions in Section XVI (Dispute Resolution) of this Consent Decree.

146.    Penalties shall continue to accrue as provided in accordance with Paragraph 144 during any dispute, with interest on accrued penalties payable and calculated at the rate established by the Secretary of the Treasury, pursuant to 28 U.S.C. § 1961, but need not be paid until the following:

a.    If the dispute is resolved by agreement or by a decision of any Plaintiff that is not appealed to the Court, accrued penalties determined to be owing, together with accrued interest, shall be paid to the United States within thirty (30) days of the effective date of the agreement or the receipt of EPA's decision or order;

b.    If the dispute is appealed to the Court and any Plaintiff prevails in whole or in part, Wisconsin Electric shall, within sixty (60) days of receipt of the Court's decision or order, pay all accrued penalties determined by the Court to be owing, together with accrued interest, except as provided in Subparagraph c, below;

c.    If the District Court's decision is appealed by any Party, Wisconsin Electric shall, within fifteen (15) days of receipt of the final appellate court decision, pay all accrued penalties determined to be owing to the United States, together with accrued interest.

147.    All stipulated penalties must be paid within thirty (30) days of the date payable, and payment shall be made in the manner set forth in Section X of this Consent Decree (Civil Penalty).

51

148. Should Wisconsin Electric fail to pay stipulated penalties in compliance with the terms of this Consent Decree, the United States shall be entitled to collect interest on such penalties, as provided for in 28 U.S.C. § 1961.

149. The stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to any Plaintiff by reason of Wisconsin Electric's failure to comply with any requirement of this Consent Decree or applicable law, except that for any violation of the Act for which this Consent Decree also provides for payment of a stipulated penalty, Wisconsin Electric shall be allowed a credit for stipulated penalties paid against any statutory penalties imposed for such violation.

## XV. FORCE MAJEURE

150. For purposes of this Consent Decree, a "Force Majeure Event" shall mean an event that has been or will be caused by circumstances beyond the control of Wisconsin Electric, its contractors, or any entity controlled by Wisconsin Electric that delays compliance with any provision of this Consent Decree or otherwise causes a violation of any provision of this Consent Decree despite Wisconsin Electric's best efforts to fulfill the obligation. "Best efforts to fulfill the obligation" include using best efforts to anticipate any potential Force Majeure Event and to address the effects of any such event (a) as it is occurring and (b) after it has occurred, such that the delay or violation is minimized to the greatest extent possible.

151. Notice. If any event occurs or has occurred that may delay compliance with or otherwise cause a violation of any obligation under this Consent Decree, as to which Wisconsin Electric intends to assert a claim of Force Majeure, Wisconsin Electric shall notify the United States in writing as soon as practicable, but in no event later than fourteen (14) business days

52

following the date Wisconsin Electric first knew, or by the exercise of due diligence should have known, that the Force Majeure Event caused or may cause such delay or violation. If the event on which the Force Majeure claim is based occurred at the Presque Isle Generating Station, Wisconsin Electric also shall provide the State of Michigan with notice. In this notice, Wisconsin Electric shall reference this Paragraph of this Consent Decree and describe the anticipated length of time that the delay or violation may persist, the cause or causes of the delay or violation, all measures taken or to be taken by Wisconsin Electric to prevent or minimize the delay or violation, the schedule by which Wisconsin Electric proposes to implement those measures, and Wisconsin Electric's rationale for attributing a delay or violation to a Force Majeure Event. Wisconsin Electric shall adopt all reasonable measures to avoid or minimize such delays or violations. Wisconsin Electric shall be deemed to know of any circumstance of which Wisconsin Electric, its contractors, or any entity controlled by Wisconsin Electric knew or should have known.

152. <u>Failure to Give Notice</u>. If Wisconsin Electric fails to comply with the notice requirements of this Section, the United States and, if the event on which the Force Majeure claim is based occurred at the Presque Isle Generating Station, the State of Michigan, may void Wisconsin Electric's claim for Force Majeure as to the specific event for which Wisconsin Electric has failed to comply with such notice requirement.

153. <u>Plaintiffs' Response</u>. The United States and, if the event on which the Force Majeure claim is based occurred at the Presque Isle Generating Station, the State of Michigan, shall notify Wisconsin Electric in writing regarding Wisconsin Electric's claim of Force Majeure within (20) twenty business days of receipt of the notice provided under Paragraph 151. To the

53

extent the Force Majeure claim involves the Presque Isle Generating Station, the United States shall consult with the State of Michigan prior to notifying Wisconsin Electric regarding its claim of Force Majeure. If the United States and, if the event on which the Force Majeure claim is based occurred at the Presque Isle Generating Station, the State of Michigan, agrees that a delay in performance has been or will be caused by a Force Majeure Event, the Parties shall stipulate to an extension of deadline(s) for performance of the affected compliance requirement by a period not to exceed the delay actually caused by the event. In such circumstances, an appropriate modification shall be made pursuant to Section XXIV of this Consent Decree (Modification).

154. <u>Disagreement</u>. If the United States and, if the event on which the Force Majeure claim is based occurred at the Presque Isle Generating Station, the State of Michigan, does not accept Wisconsin Electric's claim of Force Majeure, the matter shall be resolved in accordance with Section XVI of this Consent Decree (Dispute Resolution).

155. <u>Burden of Proof</u>. In any dispute regarding Force Majeure, Wisconsin Electric shall bear the burden of proving that any delay in performance or any other violation of any requirement of this Consent Decree was caused by or will be caused by a Force Majeure Event. Wisconsin Electric shall also bear the burden of proving that Wisconsin Electric gave the notice required by this Section and the anticipated duration and extent of any delay(s) attributable to a Force Majeure Event. An extension of one compliance date based on a particular event may, but will not necessarily, result in an extension of a subsequent compliance date.

156. <u>Events Excluded</u>. Unanticipated or increased costs or expenses associated with the performance of Wisconsin Electric's obligations under this Consent Decree shall not constitute a Force Majeure Event.

157.   <u>Potential Force Majeure Events</u>.  The Parties agree that, depending upon the circumstances related to an event and Wisconsin Electric's response to such circumstances, the kinds of events listed below are among those that could qualify as Force Majeure Events within the meaning of this Section: construction, labor, or equipment delays; Malfunction of a Unit or emission control device; natural gas and gas transportation availability delay; acts of God; acts of war or terrorism; and orders by a government official, government agency, or other regulatory body acting under and authorized by applicable law that directs Wisconsin Electric to supply electricity in response to a system-wide (state-wide or regional) emergency.  Depending upon the circumstances and Wisconsin Electric's response to such circumstances, failure of a permitting authority to issue a necessary permit in a timely fashion may constitute a Force Majeure Event where the failure of the permitting authority to act is beyond the control of Wisconsin Electric and Wisconsin Electric has taken all steps available to it to obtain the necessary permit, including, but not limited to, submitting a complete permit application, responding to requests for additional information by the permitting authority in a timely fashion, accepting lawful permit terms and conditions, and prosecuting in an expeditious fashion appeals of any allegedly unlawful terms and conditions imposed by the permitting authority.

158.   As part of the resolution of any matter submitted to this Court under this Section, the Parties by agreement, or this Court by order, may in appropriate circumstances extend or modify the schedule for completion of work under this Consent Decree to account for the delay in the work that occurred as a result of any delay agreed to by the Plaintiffs or approved by this Court.  Wisconsin Electric shall be liable for stipulated penalties for its failure thereafter to complete the work in accordance with the extended or modified schedule.

## XVI. DISPUTE RESOLUTION

159.    The dispute resolution procedure provided by this Section shall be available to resolve all disputes arising under this Consent Decree, except as provided in either this Section (Dispute Resolution) or Section XV (Force Majeure) of this Consent Decree, provided that the Party making such application has first made a good faith attempt to resolve the matter with the other Parties.

160.    The dispute resolution procedure required herein shall be invoked by one Party to this Consent Decree giving written notice to the other Parties to this Consent Decree advising of a dispute pursuant to this Section. The notice shall describe the nature of the dispute and shall state the noticing Party's position with regard to such dispute. The Parties receiving such a notice shall acknowledge receipt of the notice, and the Parties in dispute shall expeditiously schedule a meeting to discuss the dispute informally not later than fourteen (14) days following receipt of such notice.

161.    Disputes submitted to dispute resolution under this Section shall, in the first instance, be the subject of informal negotiations among the disputing Parties. Such period of informal negotiations shall not extend beyond thirty (30) calendar days from the date of the first meeting among the disputing Parties' representatives unless they agree to shorten or extend this period. During the informal negotiations period, the disputing Parties may also submit their dispute to a mutually-agreed-upon alternative dispute resolution (ADR) forum if the Parties agree that the ADR activities can be completed within the 30-day informal negotiations period.

162.    If the disputing Parties are unable to reach agreement during the informal negotiation period, the Plaintiffs shall provide Wisconsin Electric with a written summary of

56

their position regarding the dispute. The written position provided by the Plaintiffs shall be considered binding unless, within forty-five (45) calendar days thereafter, Wisconsin Electric seeks judicial resolution of the dispute by filing a petition with this Court. The Plaintiffs may respond to the petition within forty-five (45) calendar days of filing.

163.    Where the nature of the dispute is such that a more timely resolution of the issue is required, the time periods set out in this Section may be shortened upon motion of one of the Parties to the dispute.

164.    This Court shall not draw any inferences nor establish any presumptions adverse to any disputing Party as a result of invocation of this Section or the disputing Parties' inability to reach agreement.

165.    As part of the resolution of any dispute under this Section, in appropriate circumstances the disputing Parties may agree, or this Court may order, an extension or modification of the schedule for the completion of the activities required under this Consent Decree to account for the delay that occurred as a result of dispute resolution. Wisconsin Electric shall be liable for stipulated penalties for its failure thereafter to complete the work in accordance with the extended or modified schedule.

166.    As to disputes arising under Section VII of this Consent Decree (PM Emission Reductions and Controls), the Court shall sustain the position of the Plaintiffs as to the feasibility of obtaining accurate and reliable data from the PM CEMS that Wisconsin Electric is to install pursuant to Paragraph 96, unless Wisconsin Electric demonstrates that the position of the Plaintiffs is arbitrary or capricious. The Court shall decide all other disputes pursuant to applicable principles of law for resolving such disputes. In their initial filings with the Court

57

under Paragraph 162, the disputing Parties shall state their respective positions as to the applicable standard of law for resolving the particular dispute.

## XVII. EMISSIONS LIMITATIONS ON THE SOUTH OAK CREEK AND ELM ROAD GENERATING STATIONS

167.     Wisconsin Electric has submitted an application for a PSD Permit for the construction of proposed new coal-fired generating Units, which if approved will be known as the Elm Road Generating Station. If, at any time after the date of lodging of this Consent Decree, one or more of the new units at the proposed Elm Road Generating Station is approved and constructed, Wisconsin Electric shall limit the combined emissions of $SO_2$, $NO_x$, PM, mercury, VOCs, hydrochloric acid, hydrofluoric acid, and sulfuric acid from both its South Oak Creek Generating Station and its Elm Road Generating Station to 38,400 tons per year, collectively. This emission limitation is based on actual or calculated emissions of $SO_2$, $NO_x$ PM, mercury, VOCs, hydrochloric acid, hydrofluoric acid, and sulfuric acid from the existing units at South Oak Creek Generating Station in calendar year 2000. Compliance with this emission limitation shall be demonstrated on a 12-month rolling average. The emission limitation shall be included in the Title V operating permit issued to the South Oak Creek Generating Station and the Elm Road Generating Station, if approved and constructed.

## XVIII. PERMITS

168.     Unless expressly stated otherwise in this Consent Decree, in any instance where otherwise applicable law or this Consent Decree requires Wisconsin Electric to secure a permit to authorize construction or operation of any device, including all preconstruction, construction, and operating permits required under state law, Wisconsin Electric shall make such application in a

timely manner. EPA and the MDEQ will use their best efforts to expeditiously review all permit applications submitted pursuant to this Consent Decree.

169.    Notwithstanding the previous paragraph, nothing in this Consent Decree shall be construed to require Wisconsin Electric to apply for or obtain a PSD or Nonattainment NSR permit for physical changes or changes in the method of operation that would give rise to claims resolved by Section XI (Resolution of Claims) of this Consent Decree.

170.    When permits are required as described in Paragraph 168, Wisconsin Electric shall complete and submit applications for such permits to the appropriate authorities to allow sufficient time for all legally required processing and review of the permit request. Any failure by Wisconsin Electric to submit a timely permit application for any Unit in the Wisconsin Electric System shall bar any use by Wisconsin Electric of Section XV (Force Majeure), where a Force Majeure claim is based on permitting delays.

171.    Notwithstanding the reference to Title V permits in this Consent Decree, the enforcement of such permits shall be in accordance with their own terms and the Act. The Title V permits shall not be directly enforceable under this Decree, although any term or limit established by or under this Decree shall be enforceable under this Decree regardless of whether such term has or will become part of a Title V permit, subject to the terms of Section XXVIII (Conditional Termination of Enforcement Under Decree).

172.    Within ninety (90) days of entry of this Consent Decree, Wisconsin Electric shall amend any applicable Title V permit application, or apply for amendments of its Title V permits, to include a schedule for all performance, operational, maintenance, and control technology requirements established by this Consent Decree, including, but not limited to, Emission Rates,

59

removal efficiencies, limits on fuel use, and the requirement in Paragraph 80 pertaining to surrender of $SO_2$ allowances.

173.    Within one year from the commencement of operation of each pollution control device to be installed or upgraded on an Improved Unit under this Consent Decree, Wisconsin Electric shall apply to modify its Title V permit for the generating plant where such device is installed to reflect all new requirements applicable to that plant, including, but not limited to any applicable 30-Day Rolling Average Emission Rate or Removal Efficiency.

174.    Prior to January 1, 2015, Wisconsin Electric shall apply to amend the Title V permit for each plant in the Wisconsin Electric System to include specific Emission Rates or tonnage limitations as described below. Wisconsin Electric shall be in compliance with this requirement if, by January 1, 2015, it has applied to amend each such Title V permit to include Emissions Rate limitations applicable to Improved Units and tonnage limitations applicable to plants with Other Units. Improved Units shall not exceed a 12-Month Rolling Average Emission Rate for NOx of 0.080 lb/mmBTU and a 12-Month Rolling Average Emission Rate for $SO_2$ of 0.080 lb/mmBTU or a Removal Efficiency of 96% for $SO_2$. The plants with Other Units shall meet the following Plant-specific 12-Month Rolling Tonnage:

| **Plant** | **NO$_x$** | **SO$_2$** |
|:---:|:---:|:---:|
| Valley | 3, 989 | 9,973 |
| Presque Isle | 7,376 | 17, 257 |

175.    Wisconsin Electric shall provide the United States with a copy of each application to amend its Title V permit, as well as a copy of any permit proposed as a result of such application, to allow for timely participation in any public comment opportunity.

60

176. If Wisconsin Electric sells or transfers to a Third Party Purchaser part or all of its ownership interest in a Unit in the Wisconsin Electric System, Wisconsin Electric shall comply with the requirements of Paragraph 174 with regard to that Unit, prior to any such sale or transfer unless, following any such sale or transfer, Wisconsin Electric remains the holder of the Title V permit for such facility. For purposes of this Paragraph and Section XXI, "Third Party Purchaser" refers to an entity unrelated to Wisconsin Electric, WEC or W.E. Power that may acquire an ownership interest in one or more of the Units in the Wisconsin Electric System.

## XIX. INFORMATION COLLECTION AND RETENTION

177. Any authorized representative of the United States or Permitting State Agency, including their attorneys, contractors, and consultants, upon presentation of credentials, shall have a right of entry upon the premises of any facility in the Wisconsin Electric System at any reasonable time for the purpose of:

a. monitoring the progress of activities required under this Consent Decree;

b. verifying any data or information submitted to the Plaintiffs in accordance with the terms of this Consent Decree;

c. obtaining samples and, upon request, splits of any samples taken by Wisconsin Electric or its representatives, contractors, or consultants; and

d. assessing Wisconsin Electric's compliance with this Consent Decree.

178. Wisconsin Electric shall retain, and instruct its contractors and agents to preserve, all non-identical copies of all records and documents (including records and documents in electronic form) now in its or its contractors' or agents' possession or control, and that directly relate to Wisconsin Electric's performance of its obligations under this Consent Decree for the

61

following periods: (a) until December 31, 2020 for records concerning physical or operational changes undertaken in accordance with Paragraph 124 (Resolution of U.S. Claims Based On Modifications after Lodging of the Decree) and Paragraph 127 (Resolution of State of Michigan Claims based on Modifications after Lodging of the Decree) of this Consent Decree; and (b) until December 31, 2017 for all other records. This record retention requirement shall apply regardless of any corporate document retention policy to the contrary.

179. All information and documents submitted by Wisconsin Electric pursuant to this Consent Decree shall be subject to any requests under applicable law providing public disclosure of documents unless (a) the information and documents are subject to legal privileges or protection or (b) Wisconsin Electric claims and substantiates that the information and documents contain confidential business information in accordance with 40 C.F.R. Part 2.

180. Nothing in this Consent Decree shall limit the authority of the Plaintiffs to conduct tests and inspections at Wisconsin Electric's facilities under Section 114 of the Act, 42 U.S.C. § 7414, or any other applicable federal or state laws, regulations or permits.

## XX. NOTICES

181. Unless otherwise provided herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

As to the United States of America:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
DJ# 90-5-2-1-06965

62

and

Director, Air Enforcement Division
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Ariel Rios Building [2242A]
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

and

Regional Administrator
U.S. EPA Region V
77 West Jackson Blvd.
Chicago, Illinois 60604-3590


As to the State of Michigan:

Chief, Environment, Natural Resources and Agricultural Division
Michigan Department of Attorney General
P.O. Box 30217
Lansing, MI 48909

and

Chief, Air Quality Division
Michigan Department of Environmental Quality
525 W. Allegan Street
Lansing, MI 48909

As to Wisconsin Electric:

Vice President Environmental
Wisconsin Electric Power Company
231 W. Michigan Street
Milwaukee, Wisconsin 53203

and

General Counsel
Wisconsin Electric Power Company
231 W. Michigan Street
Milwaukee, Wisconsin 53203

63

182. All notifications, communications or submissions made pursuant to this Section shall be sent either by: (a) overnight mail or by certified or registered mail, return receipt requested; (b) electronic transmission, unless the recipient is not able to review the transmission in electronic form. All notifications, communications and transmissions sent by overnight, certified or registered mail shall be deemed submitted on the date they are postmarked. All notifications, communications, and submissions made by electronic means shall be electronically signed and certified, and shall be deemed submitted on the date that Wisconsin Electric receives written acknowledgment of receipt of such transmission.

183. Any Party may change either the notice recipient or the address for providing notices to it by serving the other Party with a notice setting forth such new notice recipient or address.

## XXI. SALES OR TRANSFERS OF OWNERSHIP INTERESTS

184. If Wisconsin Electric proposes to sell or transfer part or all of its ownership interest in any Existing Unit ("Ownership Interest") to an entity unrelated to Wisconsin Electric, WEC or W.E. Power (Third Party Purchaser), it shall advise the Third Party Purchaser in writing of the existence of this Consent Decree prior to such sale or transfer, and shall send a copy of such written notification to the United States pursuant to Section XX (Notices) at least sixty (60) days before such proposed sale or transfer. To the extent that a proposed sale or transfer in ownership interests involves one of more of the Units at the Presque Isle Generating Station, Wisconsin Electric also shall provide written notification to the State of Michigan at least sixty (60) days before such proposed sale or transfer.

64

185. No sale or transfer of an Ownership Interest shall take place before the Third Party Purchaser and the Plaintiffs have executed, and the Court has approved, a modification pursuant to Section XXIV (Modification) of this Consent Decree making the Third Party Purchaser a party defendant to this Consent Decree and jointly and severally liable with Wisconsin Electric for all the requirements of this Decree that may be applicable to the transferred or purchased Ownership Interests, including joint and several liability with Wisconsin Electric for all requirements specific to the Existing Unit, as well as all requirements in this Consent Decree that are not specific to these Existing Units, except as provided in Paragraph 187.

186. This Consent Decree shall not be construed to impede the transfer of any Ownership Interests between Wisconsin Electric and any Third Party Purchaser as long the requirements of this Consent Decree are met. This Consent Decree shall not be construed to prohibit a contractual allocation – as between Wisconsin Electric and any Third Party Purchaser of Ownership Interests – of the burdens of compliance with this Decree, provided that both Wisconsin Electric and such Third Party Purchaser shall remain jointly and severally liable to the Plaintiffs for the obligations of the Decree applicable to the transferred or purchased Ownership Interests, except as provided in Paragraph 187.

187. To the extent that a proposed sale or transfer in ownership interests involves one of more of the Units at the Presque Isle Generating Station, the United States shall consult with the MDEQ with regard to any proposed modification to the Consent Decree under this Section XXI. If the United States, after consultation with the State of Michigan where applicable, agrees, the United States, the State of Michigan, Wisconsin Electric, and the Third Party Purchaser that has become a party defendant to this Consent Decree pursuant to Paragraph 185, may execute a

65

modification that relieves Wisconsin Electric of its liability under this Consent Decree for, and makes the Third Party Purchaser liable for, all obligations and liabilities applicable to the purchased or transferred Ownership Interests. Notwithstanding the foregoing, however, Wisconsin Electric may not assign, and may not be released from, any obligation under this Consent Decree that is not specific to the purchased or transferred Ownership Interests, including the obligations set forth in Sections IX (Environmental Projects) and X (Civil Penalty). Wisconsin Electric may propose and the United States, in consultation with the State of Michigan where applicable, may agree to restrict the scope of joint and several liability of any purchaser or transferee for any obligations of this Consent Decree that are not specific to the Unit, to the extent such obligations may be adequately separated in an enforceable manner.

## XXII. EFFECTIVE DATE

188.     The effective date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court.

## XXIII. RETENTION OF JURISDICTION

189.     Continuing Jurisdiction. The Court shall retain jurisdiction of this case after entry of this Consent Decree to enforce compliance with the terms and conditions of this Consent Decree and to take any action necessary or appropriate for its interpretation, construction, execution, modification, or adjudication of disputes. During the term of this Consent Decree, any Party to this Consent Decree may apply to the Court for any relief necessary to construe or effectuate this Consent Decree.

66

## XXIV. MODIFICATION

190.     The terms of this Consent Decree may be modified only by a subsequent written agreement signed by all Parties. Where the modification constitutes a material change to any term of this Decree, it shall be effective only upon approval by the Court.

## XXV. GENERAL PROVISIONS

191.     This Consent Decree is not a permit. Compliance with the terms of this Consent Decree does not guarantee compliance with all applicable federal, state, or local laws or regulations.

192.     This Consent Decree does not apply to any claim(s) of alleged criminal liability.

193.     In any subsequent administrative or judicial action initiated by the United States or the State of Michigan for injunctive relief or civil penalties relating to the facilities covered by this Consent Decree, Wisconsin Electric shall not assert any defense or claim based upon principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, or claim splitting, or any other defense based upon the contention that the claims raised by the Plaintiffs in the subsequent proceeding were brought, or should have been brought, in the instant case; provided, however, that nothing in this Paragraph is intended to affect the validity of Section XI (Resolution of Claims).

194.     Except as specifically provided by this Consent Decree, nothing in this Consent Decree shall relieve Wisconsin Electric of its obligation to comply with all applicable federal, state, and local laws and regulations. Subject to the provisions in Section XI (Resolution of Claims) of this Consent Decree, nothing contained in this Consent Decree shall be construed to

67

prevent or limit the rights of the Plaintiffs to obtain penalties or injunctive relief under the Act or other federal, state, or local statutes, regulations, or permits.

195.    Every term expressly defined by this Consent Decree shall have the meaning given to that term by this Consent Decree, and, except as otherwise provided in this Decree, every other term used in this Decree that is also a term under the Act or the regulations implementing the Act shall mean in this Decree what such term means under the Act or those implementing regulations.

196.    Nothing in this Consent Decree alters or waives any applicable law (including but not limited to, any defenses, entitlements, or clarifications related to the Credible Evidence Rule (62 Fed. Reg. 8314 (Feb. 27, 1997))), concerning the use of data for any purpose under the Act, generated by the reference methods specified herein or otherwise.

197.    Each limit and/or other requirement established by or under this Decree is a separate, independent requirement.

198.    Performance standards, emissions limits, and other quantitative standards set by or under this Decree must be met to the number of significant digits in which the standard or limit is expressed. Thus, for example, an Emission Rate of 0.100 is not met if the actual Emission Rate is 0.101. Wisconsin Electric shall round the fourth significant digit to the nearest third significant digit, or the third significant digit to the second significant digit, depending upon whether the limit is expressed to two or three significant digits. Thus, for example, if an actual Emission Rate is 0.1004, that shall be reported as 0.100, and shall be in compliance with an Emission Rate of 0.100, and if an actual Emission Rate is 0.1005, that shall be reported as 0.101, and shall not be in compliance with an Emission Rate of 0.100. Wisconsin Electric shall collect

68

and report data to the number of significant digits in which the standard or limit is expressed. As otherwise applicable and unless this Decree expressly directs otherwise, the calculation and measurement procedures established under 40 C.F.R. Parts 75 and 76 apply to the measurement and calculation of $NO_x$ and $SO_2$ under this Decree.

199.    This Consent Decree does not limit, enlarge or affect the rights of any Party to this Consent Decree as against any third parties.

200.    This Consent Decree constitutes the final, complete and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree, and supercedes all prior agreements and understandings among the Parties related to the subject matter herein. No document, representation, inducement, agreement, or understanding, or promise constitutes any part of this Decree or the settlement it represents, nor shall they be used in construing the terms of this Consent Decree.

201.    Each Party to this action shall bear its own costs and attorneys' fees.

## XXVI. SIGNATORIES AND SERVICE

202.    Each undersigned representative of the Parties certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

203.    This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.

204.    Each Party hereby agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service

69

requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXVII. PUBLIC COMMENT

205.     The Parties agree and acknowledge that final approval by the United States and entry of this Consent Decree is subject to the procedures of 28 C.F.R. § 50.7, which provides for notice of the lodging of this Consent Decree in the Federal Register, an opportunity for public comment, and the right of the United States to withdraw or withhold consent if the comments disclose facts or considerations which indicate that the Consent Decree is inappropriate, improper or inadequate. Wisconsin Electric shall not oppose entry of this Consent Decree by this Court or challenge any provision of this Consent Decree unless the United States has notified Wisconsin Electric, in writing, that the United States no longer supports entry of the Consent Decree.

## XXVIII. CONDITIONAL TERMINATION OF ENFORCEMENT UNDER DECREE

206.     Termination as to Completed Tasks.  As soon as Wisconsin Electric completes a construction project or any other requirement of this Consent Decree that is not ongoing or recurring, Wisconsin Electric may seek termination of the provision or provisions of this Consent Decree that imposed the requirement.

207.     Conditional Termination of Enforcement Through the Consent Decree.  Once Wisconsin Electric:

(A) believes that it has successfully completed and commences successful operation of all pollution controls required by this Decree;

70

(B) has obtained final Title V permits (a) as required by the terms of this Consent Decree; (b) that cover all Units in this Consent Decree; and (c) that include as enforceable permit terms all of the Unit performance and other requirements required by Section XVIII (Permits); and

(C) certifies that the date is later than December 31, 2015;

then Wisconsin Electric may so certify these facts to the Plaintiffs and this Court. If the Plaintiffs do not object in writing with specific reasons within forty-five (45) days of receipt of Wisconsin Electric's certification, then, for any violations that occur after the filing of notice, the Plaintiffs shall pursue enforcement of the requirements contained in the Title V permit through the applicable Title V permit and not through this Consent Decree.

208. <u>Resort to Enforcement under this Consent Decree.</u> Notwithstanding Paragraph 207, if enforcement of a provision in this Decree cannot be pursued by a party under the applicable Title V permit, or if a Decree requirement was intended to be part of a Title V Permit and did not become or remain part of such permit, then such requirement may be enforced under the terms of this Decree at any time.

## XXIX. FINAL JUDGMENT

209. Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between the Plaintiffs and Wisconsin Electric.

SO ORDERED, THIS __1st__ DAY OF __October__ , 200_7_

_____
THE HONORABLE CHARLES N. CLEVERT, JR.
UNITED STATES DISTRICT COURT JUDGE

71

FOR THE UNITED STATES OF AMERICA:


KELLY A. JOHNSON
Principal Deputy Assistant Attorney General
Environmental and Natural Resources Division
United States Department of Justice


NICOLE VEILLEUX
ARNOLD ROSENTHAL
Trial Attorneys
Environmental Enforcement Section
Environmental and Natural Resources Division
United States Department of Justice

MATTHEW V. RICHMOND
Chief, Civil Division
Eastern District of Wisconsin
United States Department of Justice

JOHN PETER SUAREZ
Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency


BRUCE C. BUCKHEIT
Director, Air Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency


EDWARD MESSINA
Attorney Advisor
Air Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

THOMAS SKINNER
Regional Administrator
Region 5
United States Environmental Protection Agency

**FOR WISCONSIN ELECTRIC:**

RICHARD R. GRIGG
President and Chief Operating Officer
Wisconsin Electric Power Company

**FOR THE STATE OF MICHIGAN**

MICHAEL A. COX
Attorney General

By: _____

NEIL D. GORDON
Assistant Attorney General
Environment, Natural Resources, and Agricultural
Division


_____

G. VINSON HELLWIG
Chief, Air Quality Division
Michigan Department of Environmental Quality

77